**PORT OF SEATTLE**
v.
**The UNITED STATES.**
No. 239–67.

United States Court of Claims.
Nov. 12, 1971.

Edward G. Lowry, III, Seattle, Wash., attorney of record, for plaintiff.

Ronald E. McKinstry and Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., of counsel.

Arthur D. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for defendant.

Before LARAMORE, Acting Chief Judge, JONES, Senior Judge, and DUR-FEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on February 1, 1971. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not en-

titled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

WOOD, Commissioner: The issue presented by this case is whether defendant breached an obligation to plaintiff, arising from Supplemental Agreement No. 3, dated February 15, 1960, to Lease W 7034 qm–63. The "Pier portion only of Pier 38" was owned by defendant, but was situated on Port-owned land leased to defendant. Supplemental Agreement No. 3 required defendant to remove the "Pier portion only of Pier 38 * * * at any time prior to the expiration or termination of said lease."

In May 1964, plaintiff offered to purchase certain government-owned property in Seattle, Washington, commonly known as the Seattle Port of Embarkation,[1] for $4,000,000. The offer was accepted by defendant September 9, 1964. The parties agreed (*inter alia*) that, simultaneously with the closing of the transaction, the outstanding leases between the Port and defendant covering the "Pier 38" leasehold (and "Pier 39", also leased to defendant) "shall be terminated *and the improvements thereon shall be conveyed and transferred to the Port of Seattle.*" [Emphasis supplied.]

To and after the closing effective June 25, 1965, defendant failed to remove Pier 38. Plaintiff subsequently had Pier 38 removed, and it here seeks to recover the cost of such removal, asserting that defendant's failure to remove the Pier was a violation of Supplemental Agreement No. 3. Defendant's position is that the removal obligation admittedly imposed upon it by the Supplemental Agreement was effectively superseded by the 1964 contract.

On the basis of the findings of fact, and ultimate findings and conclusions, set forth below, it is concluded that de-

fendant is right; that plaintiff is not entitled to recover; and that the petition should be dismissed.

## FINDINGS OF FACT

1. Plaintiff (sometimes hereinafter called "the Port") is a municipal corporation organized under the laws of the State of Washington. Pursuant to its statutory powers and authority, the Port, among other things, owns and operates certain marine terminal structures at tidewater in the City of Seattle (King County), Washington. During the period here material, the Port was administered by a five-man Board of Harbor Commissioners, or Port Commission. The Commission had a substantial staff, including a general manager, assistant general manager, and manager of the Property Management Department (whose duties included responsibility for negotiation of leases of Port properties, renewal and amendment of such leases, and negotiations for acquisition of properties by the Port); however, all real property transactions required formal action by the Port Commission.

2. This case involves a real property transaction closed June 24, 1965, between plaintiff as buyer, and defendant as seller, encompassing certain interests defendant had in a military installation, established in the early 1940's, at 1519 Alaskan Way South, Seattle, Washington. The installation has variously been referred to from time to time as the Seattle Port of Embarkation, the Seattle Quartermaster Depot, the Seattle Sub-Port of Embarkation, the Seattle Army Terminal, and the Seattle District Engineer Headquarters, and is hereinafter sometimes called the "Port of Embarkation". During the period 1962–1964, the Port of Embarkation included "Pier 38" and "Pier 39", owned by plaintiff but made a part of the installation through leases between plaintiff and various government agencies.[1]

---

1. The "Pier 38" leasehold, largely submerged tidelands, was part of this installation.

1. Both "Pier 38" and "Pier 39" were then leased to defendant at a rental of $1.00

per year, under leases which could be terminated only by defendant. See findings 3, 4, *infra*. The "Pier portion only of Pier 38", owned by defendant, was located on "Pier 38", *i. e.*, the leased premises.

3. (a) In the 1962–1964 period, defendant occupied "Pier 38" pursuant to Lease W 7034 qm–63, dated May 15, 1941 (between the Port and defendant, acting through the Army Quartermaster Corps), as amended by Supplemental Agreement to Dispense with Notice of Renewal, dated May 31, 1943, Supplemental Agreement No. 2, dated June 28, 1949 (between the Port and defendant, acting through the Army Corps of Engineers), and Supplemental Agreement No. 3 dated February 15, 1960 (between the Port and defendant, acting through the Army Corps of Engineers).

(b) The 1941 lease, calling for a rental of $400 per month, described the leased premises as "Approximately * * (20,000) square feet of space at the Atlantic Street Terminal, Pier "B", Seattle, Washington * * *," and was for the period June 1, 1941, to June 30, 1941, with option of renewal annually thereafter to June 30, 1943. Defendant reserved the right to cancel the lease at any time by giving 30 days' advance written notice to the Port prior to releasing the property, and was permitted to make alterations to, and affix fixtures and structures upon, the leased premises; it agreed that, if duly required to do so by the Port, it would, "before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, * * *" with certain stated exceptions.

(c) Effective July 1, 1943, the said lease was amended to provide that the term of the lease would run to June 30, 1944, "provided that, unless and until the Government shall give notice of termination in accordance with provisions thereof, this lease shall remain in force thereafter from year to year without further notice; * * *."

(d) Effective July 1, 1949, the said lease was further amended in several respects: *inter alia*, the legal description of the leased premises was modified; the term of the lease was extended to June 30, 1950, "provided that unless and until the Government shall give notice of termination in accordance with the provision 12 of the lease, this lease shall remain in force thereafter from year to year without further notice * * *"; the rental payable by defendant to the Port was reduced to $1.00 per year; and, any fixtures attached, or structures or signs erected, on the leased premises were to "be and remain the property of the Government and may be removed or otherwise disposed of by the Government, and without liability or remuneration for restoration costs."

(e) Effective January 1, 1960, the lease was further amended in several respects. *Inter alia*, the legal description of the leased premises was revised to read as follows:

Beginning at a point which lies 634.55 feet west of and 69.5 feet south of a city monument which lies in South Alaskan Way and on the center line of West Connecticut Street, the Seattle Tideland Coordinates of said monument are N. 19,622.780, E. 31,947.106; thence south 220.5 feet to the south line of Lot 4, Block 369, Seattle Tidelands; thence West along the south line of Lot 4, 926.551 feet to the outer harbor line; thence North 170° 14' 15" East 230.869 feet along the outer harbor line; thence East 858.137 feet to the point of beginning; containing 4.51 acres, more or less, in the City of Seattle, County of King, State of Washington; said tract of land being part of Lots 1, 2, 3, and 4, Block 369, Seattle Tidelands; together with the harbor area adjoining said tract including a triangular tract of the Duwamish River (East) Waterway area and including the following lessor-owned improvements:

A Pier apron of treated piling and heavy timber construction, asphalt surfaced, a structure approximately 51.3' x 200', known as the Apron for Pier 38, located on the easterly 51.3' of the above described premises; as shown on map attached hereto, and made a part hereof, and marked Revised "EXHIBIT 'A'"; * * *.

The following supplemental provisions (among others) were also added to the lease [emphasis supplied]:

17. That *the Lessor*, in consideration of execution by the Government and the Lessor of Supplemental Agreement No. 1 to Lease W45–108–eng–2359 and of the assumption by the Government of responsibility for demolition and removal of the structure known as the Pier portion only, of Pier 38, *hereby relinquishes, transfers, and delivers to the Government, the Lessor-owned improvements now situate on the premises* described in said lease, as follows:

"*A Pier, known as Pier 38*, of treated pilings and heavy timber construction, approximately 820 feet in length, the westerly 400 feet being 50 feet wide, and the remainder 100 feet wide, *and a one-story transit shed* of corrugated iron on wood frame construction 300 feet in length and averaging 70 feet in width, *situated on* the wider portion of *said Pier.*"

18. That *the Government hereby agrees and consents to remove all of the above described and transferred improvements known as the Pier portion only of Pier 38* at no cost or expense to the Lessor, such removal to be at the option of the Government, either accomplished currently or *at any time prior to the expiration or termination of said lease.*

19. The Lessor, in consideration of the sum of One and No/100 Dollars ($1.00) and the considerations heretofore recited, hereby remises, releases, and forever discharges, and by these presents does for itself, its successors, and assigns, remise, release, and forever discharge the United States of America, its officers, agents and employees of and from all manner of actions, liability, and claims (except any unpaid rental for the period ending 31 December 1959) against the United States of America, its officers, agents, and employees which it or they ever had, now have, or ever will have upon, or by reason of any matter, cause, or thing whatsoever, arising out of the use by the Government of Lessor-owned improvements which have been deleted from said lease by this Supplemental Agreement No. 3 and by reason of any deficiency in maintenance of said lessor-owned improvements by the Government from period beginning 1 July 1949 through 1 January 1960, the effective date of this Agreement.

20. The Lessor hereby agrees and covenants to waive and forego any future claim for restoration of the premises, leased to the Government under said lease as amended by Supplemental Agreements Nos. 1, 2, and 3, arising out of said lease and the occupation by the United States of America of the premises described in revised Condition 2, effective 1 January 1960.

(f) On Exhibit A, referred to in finding 3(e), *supra* (in evidence as Plaintiff's Exhibit 4–A), the premises subject to the "Pier 38" lease (largely submerged tideland) are outlined in red; the Pier 38 structure transferred to defendant is shown in solid red. Pier 38 bears the numerical designation "1033", and a building on Pier 38 bears the numerical designation "1001". The Pier 38 apron, referred to in finding 3(e), *supra*, is a rectangular-shaped area within the red outline, just east of the solid red area denoting Pier 38.

4. (a) During the 1962–1964 period, defendant occupied "Pier 39" pursuant to Lease No. W45–108–ENG–2359, dated June 28, 1949, as amended by Supplemental Agreement No. 1, dated February 15, 1960 (both between the Port and defendant, acting through the Army Corps of Engineers).

(b) The original "Pier 39" lease, running from year to year, called for a rental of $1.00 per year, and gave defendant (1) the right to terminate the lease on 30 days' written notice and (2) to attach fixtures, or erect structures or signs, on the leased premises, with such fixtures, structures, or signs to "be and remain the property of the Government and may be removed or otherwise disposed of by

the Government, and without liability or remuneration for restoration costs."

(c) Effective January 1, 1960, the "Pier 39" lease was amended by, *inter alia*, reducing the size of the premises leased to defendant by some 63,300 square feet; the legal description of the leased premises was revised; and the following paragraph was added:

17. That the Lessor hereby remises, releases, and forever discharges the Government, its officers, agents and employees, of and from any and all manner of actions, liability, and claims (except any unpaid rent for the period ending 31 December 1959) against the Government, its officers, agents, and employees, which the Lessor now has or ever will have for the restoration of the premises described in Condition 14 above or any reason whatsoever particularly arising out of said lease and the occupation by the Government of the premises described in Condition 14 above.

All government-owned improvements situated on the area deleted from the lease were transferred to the Port "in return for their predetermined fair market value as determined by the Government."

5. Plaintiff began negotiations to acquire the Port of Embarkation as early as 1957. On January 1, 1962, Mr. Fred B. Crawford was employed as manager of plaintiff's Property Management Department.[2] Shortly thereafter, Mr. Crawford was asked by the Port to review its files and to become familiar with the matter of the Port's recovery of its leased areas (and obtaining government-owned Piers 36 and 37). Mr. Crawford recommended that an appraiser be hired to appraise "the property," and, in December 1962, plaintiff obtained an appraisal from Gene M. Conger, M.A.I., of Fenton, Conger & Ballentine, Inc.,

appraisers and consultants in real estate, with offices in Seattle, Washington.

6. Mr. Conger's appraisal included the "property generally identified as Piers 36, 37, 38 and 39 and encompassing that property designated as Seattle District Headquarters of the Corps of Engineers and property owned by the Port of Seattle generally described as Piers 38 and 39", and reflected that "the Fair Market Value of the Subject Property in its present condition is $4,700,000." This value "is based upon consideration of the entire property as if in a single ownership, recognizing the existence of Pier 38 but taking into consideration the cost of its removal, and assuming that existing leases do not encumber the property." In response to plaintiff's request for "an informed, but theoretical, segregation of the total value", Mr. Conger made (within certain, stated, limitations) a segregation as follows: [3]

| | Port owned | Government owned | Total |
|---|---|---|---|
| Land | $585,000 | $1,962,000 | $2,547,000 |
| Improvements | [1] −50,000 | 2,203,000 | 2,153,000 |
| Total | 535,000 | 4,165,000 | 4,700,000 |

[1] Estimated cost of removal of Pier 38, including salvage value of materials, and represents a burden to the land.

Mr. Conger's report indicated that Pier 38 was "in very bad condition and has been condemned for use for several years", and that its "demolition appears desirable for best utilization of adjoining facilities."

7. By letter dated February 6, 1963, from the Director of Real Estate, Office of Chief of Engineers, Department of the Army, Washington, D. C., to the Assistant Secretary of the Army for Installations and Logistics, the Assistant Secretary was advised, *inter alia*, that the "Seattle Army Terminal" was excess to

---

2. Mr. Crawford became assistant to the Port general manager in mid-1964, and assistant general manager about January 1, 1965.

3. At this point, an obligation to demolish Pier 38 was clearly imposed on the government by Supplemental Agreement No. 3 to Lease W 7034 qm–63 (finding 3(e), *supra*). Mr. Conger's reasons for assigning a negative value to *Port-owned* land are unclear, but this approach had no impact on his opinion of total value.

the civil works requirements of the Corps of Engineers, provided that other suitable space for headquarters of the District Engineer, U. S. Army Engineer District, Seattle (then occupying a portion of the Terminal) could be located; and that because of its dilapidated condition Pier 38 had been condemned and "must be removed by the Government under the terms of its lease with the Port." On March 18, 1963, a detailed "Preliminary Report of Excess Property", which, *inter alia*, noted defendant's obligation to remove "the Pier portion, only, of Building 1001 at any time prior to termination of the lease", was transmitted from the U. S. Army Engineer District, Seattle, to Region 10, General Services Administration, Auburn, Washington (hereinafter "Region 10").

8. By letter dated June 30, 1963, to Region 10, Donald H. Yates, M.A.I., of Yates, Wood & MacDonald, commercial real estate managers and brokers, with offices in Seattle, transmitted an appraisal of "the offices of the U. S. Army Engineers at 1519 Alaskan Way So., Seattle * * *." In Mr. Yates' opinion, the fair market value of the land owned in fee by defendant was $5,400,-000; and the "negotiable" value of government-owned improvements on "in-leased parcels" was $300,000, for a total "value" of $5,700,000. Mr. Yates was aware of defendant's obligation to demolish under Supplemental Agreement No. 3 to Lease W 7034 qm–63 (finding 3(e), *supra*). He estimated the cost of demolition to be $50,000, and that the depreciated value of "Buildings 1001 and 1033" was $27,000. His report also stated that:

> This estimate [$27,000] is for purposes of illustration. In light of the removal agreement between leasor and lessee it is not included in the estimated 'negotiable' value of other improvements located on in-leased parcels. It is my recommendation that rather than proceed under the assumption that these structures be demolished, an effort should be made to obtain credit against the estimated cost of such dem-

olition of their appraised residual value.

> * * * instead of proceeding with demolition the difference of $23,000.00 might be acceptable to the Port of Seattle as payment in lieu.

On October 7, 1963, a Regional Appraiser, Utilization and Disposal Service (hereinafter "UDS"), Region 10, recommended approval of the Yates appraisal, and on October 16, 1963, the Director, Appraisal Staff, GSA, Washington, D. C., approved the said appraisal (amended to include $5,000 for related personal property).

9. On October 23, 1963, the Regional Appraiser, UDS, Region 10, advised the Chief, Real Property Division, UDS, Region 10, of approval of the Yates appraisal, and that estimated values as of June 30, 1963, were:

| | |
|---|---|
| Fair market value of fee-owned parcel | $5,400,000 |
| Fair market value, related personal property | 5,000 |
| "Negotiable Value" of improvements on in-leased parcels | 300,000 |
| Total | 5,705,000 |

The said Regional Appraiser further stated that:

> "Negotiable Value" as listed above is a complex quantity which can best be understood by reference to the report. There it will be seen that a residual value, estimated at $27,000 which remains in Pier 38 (Structures 1001 and 1033) is not included in the $300,000 figure. This $27,000 residual is also approved.

10. (a) Prior to February 14, 1964, both parties were cognizant of defendant's contractual obligation to remove "the Pier portion only of Pier 38 * * either * .* * currently or at any time prior to the expiration or termination of said lease." (Finding 3(e), *supra*).

(b) By memorandum dated January 31, 1964, the Regional Administrator, Region 10, advised the Commissioner, UDS, GSA, that among some nine factors expected to influence the forthcoming complex negotiations for disposal of the Port of Embarkation were (1) that

the Port appraisal of the property was understood to be approximately $1,400,-000 less than the "approved" GSA appraisal thereof, and (2) settlement of restoration obligations for improvements located on land leased by the Port to defendant under two land leases.

(c) By memorandum dated February 7, 1964, from the Chief, Real Property Division, UDS, Region 10, to the Assistant Commissioner for Real Property, UDS, GSA, there was further allusion to, *inter alia*, the complexity of the forthcoming negotiations, and the necessity for including therein "termination of two land leases, including settlement for Government-owned improvements and certain restoration items." The said memorandum suggested that:

> * * * the first consideration for negotiations should be the termination of Lease No. W–7034–QM–63 [on "Pier 38"] and Lease W–45–108–eng–2359 [on "Pier 39"]. In the settlement of the first lease it will be necessary to consider the Government's obligation to remove the improvements prior to termination. * * * The appraisal indicates a net return to the Government for the value of the improvements on Pier 39, and obligation to remove Pier 38 to be $277,000. * *

11. On February 14, 1964, the first formal negotiation conference [4] between the parties with respect to sale of the Port of Embarkation was held in the office of the Commissioner, UDS, GSA, in Washington, D. C. Mr. Crawford, and two Port Commissioners, were present in behalf of the Port; GSA representatives present in behalf of defendant included the Commissioner, UDS; the Assistant Commissioner for Real Property, UDS; the Director, Western Division; and the Chief, Real Property Division, Region 10.

12. (a) At the outset of the February 14, 1964, conference, Mr. Crawford delivered to the GSA representatives present a four-page document entitled "Port of Seattle Proposal to Acquire United States Government Property— Seattle Piers 36, 37 and Improvements on Piers 38 and 39"; with an attached "Historical Review" covering Piers 38 and 39.

(b) The Port's "Proposal", which set forth generally the Port's desires, purposes, and propositions respecting the Port of Embarkation, alluded (among other things) to defendant's obligation to "remove the improvements situated on the leased area (Pier 38) at the termination of the lease", and proposed that defendant "sell the Pier 36 and Pier 37 area and the Government-owned improvements on Piers 38 and 39 on a negotiated basis."

(c) After lengthy discussion, the Port representatives advised that they were prepared to make a. cash offer of $3,-000,000 for the "subject property", plus free rent. (without services) for the Army Corps of Engineers for 5 years, calculated by the Port to be worth $1,-680,000. GSA representatives advised the Port representatives that GSA's (Yates) appraisal showed the property had "a value of $5,705,000 including improvements on the parcels leased from the Port of Seattle against which some allowance, to be determined, could be made for the free rent for the Engineers plus a minor adjustment for the cost of removal of improvements on Pier 38," and that GSA was required by statute to obtain a price "not less than the estimated fair market value" for the property.[5]

(d) After being apprised of defendant's "value", Port representatives withdrew from the conference to discuss the matter privately; the conference then re-

---

4. There had been at least one earlier, preliminary, meeting between representatives of the parties to discuss the proposed negotiated sale.

5. The quotation is from defendant's memorandum for files of February 24, 1964. Compare findings 8, 9. The statute alluded to is Section 203(e) (3), Act of June 30, 1949, 63 Stat. 377, as amended, 40 U.S.C. § 484(e) (3) (1964).

sumed and GSA representatives were advised that the Port's offer could not be increased at that time. Mr. Crawford requested an opportunity to review a copy of the government appraisal, to see if he could ascertain where the considerable difference in value between that and the Port's appraisal came from, and suggested that the matter be further discussed thereafter. The conference then concluded.

(e) Port representatives did not have access to the Yates appraisal prior to, or at, the February 14, 1964, conference, nor were they advised at that time of Mr. Yates' appraisal of Pier 38 and his estimated cost of its removal (finding 8, *supra*). GSA gave the Port no dollar amounts of any "minor adjustment for the cost of removal of improvements on Pier 38." In terms of the overall picture, Pier 38 was a fairly minor item to. both parties.

13. (a) Despite the broad language of the Port's "Proposal", Mr. Crawford, its author, did not intend the "Proposal" to affect or diminish the Pier 38 removal obligation then imposed on defendant. He testified at trial that he understood "improvements" to mean something of value placed or situated on land, not Pier 38, which he regarded as a liability because of its condition in 1964, and that, in tendering the "Proposal" to defendant, he was aware of the government's Pier 38 removal obligation. Mr. Crawford did not apprise the GSA representatives of his understanding of "improvements" during the negotiations.

(b) Defendant intended, prior to and on February 14, 1964, to eliminate its Pier 38 removal obligation as part of the sale transaction.

(c) While the possibility of a "minor adjustment for the cost of removal of improvements on Pier 38" was brought up by GSA representatives on February 14, 1964, the record does not establish agreement at the said conference to the amount of, or even to the making of, such an adjustment in lieu of defendant's Pier 38 removal obligation.

14. Within a few days after the conclusion of the February 14, 1964, conference in Washington, D. C., Mr. Crawford reviewed a copy of the Yates appraisal (made available to him for that purpose by the Chief, Real Property Division, UDS, Region 10) "to ascertain where within the [Conger and Yates] appraisals the major difference [sic] occur." By memorandum dated February 20, 1964, to plaintiff's general manager, Mr. Crawford stated that, after thoroughly reviewing the appraisals and discussing the "problem" with GSA representatives, the government probably would not reduce the Yates appraisal figure of $5,-705,000, and that if the Port "wishes to acquire this property at this time it must pay the asking price * * *." He noted that GSA had evidenced a willingness to pay rent for government-occupied space at the Port of Embarkation as long as such space should be so occupied, that government occupation of such space for more than 5 years was "quite conceivable", and that, "if you consider this rental income a reduction in purchase price, the Port could acquire this property at a net cost of $4,000,000 five years from now." He recommended that the Port acquire the property as soon as possible at the government-appraised price of $5,705,000, and that a lease-back to defendant as favorable to the Port as possible be negotiated simultaneously. The said memorandum did not allude to Mr. Yates' Pier 38 opinions and recommendation (finding 8, *supra*).

15. By letter dated March 5, 1964, the Chief, Real Property Division, UDS, Region 10, forwarded to Mr. Crawford "for your information" a "copy of the legal description of the Government-owned property at the offices of the Seattle District Engineer", and "latest copies of the Terms and Conditions Applicable to Negotiated Sale." The said letter stated that "The description used in the conveyance of the property will be very similar to the attached." The document attached, captioned "Description of Property to be conveyed at Of-

fices of Seattle District Engineer", read in part as follows: [6]

\* \* \* \* \* \*

TOGETHER WITH Government-owned *improvements on the following described property:*

\* \* \* \* \* \*

Beginning at a point which lies 634.55 west of and 69.5 feet south of a city monument which lies in South Alaskan Way and on the center line of West Connecticut Street, the Seattle Tideland Coordinates of said monument are N. 19,622.780, E. 31,947.106; thence south 220.5 feet to the south line of Lot 4, Block 369, Seattle Tidelands; thence West along the south line of Lot 4,926.551 feet to the outer harbor line; thence North 17° 14′ 15″ East 230.869 feet along the outer harbor line; thence East 858.137 feet to the point of beginning;

\* \* \* \* \* \*

16. On March 18, 1864, at defendant's request, representatives of GSA and plaintiff met at the Port offices for a further conference. Mr. Crawford, and two Port Commissioners, were present in behalf of plaintiff; GSA representatives included the Assistant Commissioner for Real Property, UDS, and the Chief, Real Property Division, UDS, Region 10.[7] After some inconclusive discussion centering on appraisals (including the possibility of obtaining a third one), the Assistant Commissioner for Real Property

\* \* \* stated that consideration is being given for the retention, by the Government, of Buildings No. 7, No. 1, No. 2 and Building No. 34 and the underlying land consisting of slightly less than 4 acres; with the remaining Government-owned property to be offered to the Port of Seattle for sale and the negotiations to include the termination of leases underlying Piers 38 and 39.

Mr. Crawford estimated that, eliminating the above property from the sale, the Conger appraisal of $4,700,000 would be reduced by approximately $1,100,000 (to $3,600,000). The Chief, Real Property Division, UDS, Region 10, estimated that, eliminating the said property from the sale, the Yates appraisal of $5,700,000 would be reduced by some $2,100,000 (to $3,600,000).[8] The Port personnel present were interested in this approach to the problem, but were not in a position to make any commitments. GSA representatives present made it clear to Port personnel that they too were "subject to review." It was finally agreed that defendant's representatives would review the Yates appraisal, estimate the reduction of "fair market value" therein from eliminating the above property from the sale, and advise the Port "later in. the day as to our findings." After the conference concluded, the GSA representatives concluded that "the estimated reduction, subject to verification, would be $1,770,000, reducing the total estimated fair market value to $3,935,000 \* \* \*." The Port was not, however, so advised.

17. There is no evidence of any further "negotiations" specifically directed to the termination of leases underlying Piers 38 and 39, or to the Pier 38 removal problem, prior to defendant's acceptance of a Port offer to purchase the real property. On April 13, 1964, Mr. Crawford informally advised GSA that the Port Commission would meet April 28, 1964, to act on a resolution authorizing the submission of an offer (believed by GSA to be $4,000,000) to purchase the Port of Embarkation (except the four buildings and approximately four acres defendant proposed to retain). In a memorandum dated April 28, 1964, to the

---

6. Compare finding 3(e), *supra.*

7. Except for Mr. Crawford, none of the participants in the negotiations of March 18, 1964, and thereafter, testified at trial of this case, nor did any Port Commissioner.

8. The memorandum for files of the Chief, Real Property Division, UDS, Region 10, quoted in this finding, indicates that the $2,100,000 reduction would result in a price of $3,700,000 for the remaining property; it does not mention the Pier 38 removal obligation.

Port general manager, Mr. Crawford stated that GSA representatives had advised the Port that *"they feel an offer of $4,000,000 for the piers, land, improvements on Port land, and all other appurtenances would be acceptable * * *"*,[9] that this price "falls within the amount the Port has been discussing in the past", and that he recommended that the Port Commission authorize the general manager to offer $4,000,000 for the said real property.

18. While Mr. Crawford may have been under the impression in 1964 that the Yates appraisal was the basis for GSA's advice concerning the acceptability of an offer of $4,000,000, no government official or employee advised him that the property to be transferred had been appraised at $4,000,000, nor was he even told that defendant had an appraisal of the reduced area to be sold to the Port.[10] He believed that the Yates appraisal had been adjusted to reflect the reduced area, and "possibly I made an assumption that the appraisal was then within just a few dollars of" that figure.

19. By Port Resolution No. 2167 adopted April 28, 1964, plaintiff authorized its general manager to offer to defendant $4,000,000 for the purchase of "a certain tract of land consisting of approximately 24.17 acres * * *." Section 3 of the Resolution further provided that:

*Simultaneously with the closing of the purchase* authorized herein, *the outstanding leases between the Port of Seattle and the United States* of America *covering Port of Seattle properties as described in said leases,* being Government *Lease No. W–7034–9M–63 (Pier 38)* [sic] *and* Government *Lease No. W–45–108–ENG–2359 (Pier 39), shall be terminated and the improvements thereon shall be conveyed and transferred to the Port of Seattle.* (Emphasis supplied).

Port Resolution No. 2167 was prepared by, or for, the Port, probably by its then legal counsel (deceased at time of trial). The above-quoted wording of Section 3 of the Resolution does not appear in defendant's March 5, 1964, letter to the Port (finding 15, *supra.*) [11] Port Resolution No. 2167 did incorporate by reference "Terms and Conditions Applicable to Negotiated Sale" forwarded to the Port with defendant's March 5, 1964 letter.[12]

20. By letter dated May 8, 1964, to Region 10, the Port advised defendant of Port Resolution No. 2167, forwarded therewith a copy of the said Resolution, and formally offered to purchase the said real property for $4,000,000. The Port's May 8, 1964, letter to defendant, prepared by Mr. Crawford for signature of the Port general manager, and based on the Resolution, repeated Section 3 of the Resolution, quoted in finding 19, *supra,* verbatim.

21. Port Resolution No. 2167 was modified in certain respects, at the request of GSA, by Port Resolution No. 2168 adopted May 15, 1964. A minor error in legal description was corrected, and certain terms and conditions were added to those theretofore incorporated

---

9. Emphasis supplied. Neither the date of GSA's said advice, nor its exact source, is established by the record.

10. While defendant did obtain a supplemental appraisal of the "Fair Market Value" of the reduced real property, the Port's offer to purchase for $4,000,000 antedated the supplemental appraisal. See finding 22, *infra.*

11. Mr. Crawford "would believe that [Section 3] to be our wording," not language suggested by defendant.

12. One provision so incorporated was a standard integration clause:
   1. These terms and conditions, the offer, and the acceptance thereof shall constitute an agreement for disposal between the offeror and the Government. Such agreement shall constitute the whole contract to be succeeded only by the formal instruments of transfer unless modified in writing and signed by both parties. No oral statements or representations made by, for, or ostensibly on behalf of either party shall be a part of such contract. * * *

by reference.[13] The modifying Resolution was submitted to Region 10 by letter dated May 15, 1964.

22. Under date of June 9, 1964, Mr. Yates submitted to defendant a supplemental appraisal of the Port of Embarkation (less the four buildings and approximately four acres to be retained by defendant). The supplemental Yates appraisal expressed the opinion that the reduced real property had a "Fair Market Value", as of June 30, 1963, of $3,-946,000. The supplemental appraisal did not reflect any change in approach to Pier 38 from the original Yates appraisal. Defendant did not inform the Port of the supplemental appraisal, or of the opinion contained therein. The supplemental appraisal (which included real property only) was approved by GSA June 10, 1964, resulting in a total "estimated Fair Market Value", including related personal property, of $3,951,000.

23. By memorandum dated June 12, 1964, the Regional Administrator, Region 10, recommended to the Administrator, GSA, sale (pursuant to Section 203 (e) (3) (H) of the Act of June 30, 1949, *supra*) [14] of "subject property" to plaintiff for $4,000,000. In an Explanatory Statement attached to the said memorandum, the "Appraised Fair Market Value" of the property to be sold to plaintiff was stated to be $3,951,000. The Explanatory Statement also stated, by way of "Background and Justification", that plaintiff had submitted an offer of $4,-000,000 "for the balance of the Government's interest"; that the proposed sale was consistent with statutory objectives and requirements for negotiated sales of

surplus property; and that among the factors contributing to this conclusion was that "The proposed sales price exceeds the appraised fair market value of the property and other terms of the proposed disposal are satisfactory." There was no explicit reference to defendant's obligation pursuant to Supplemental Agreement No. 3 to Lease W 7034 qm–63 to remove Pier 38 "prior to the expiration or termination of said lease."

24. The Regional Administrator's recommendation was approved by the Assistant Commissioner, Real Property, GSA; the Commissioner, UDS, GSA; and, on June 24, 1964, by the Administrator, GSA. Also on June 24, 1964, the Administrator, pursuant to Section 203(e) (6) of the Act of June 30, 1949, *supra*, transmitted an "Explanatory Statement" identical to that described in finding 23, *supra*, to the Chairman, Committee on Government Operations, United States Senate.

25. In mid-1964, at GSA's requests, (a) the Port amended its purchase offer to provide for the closing of the sales transaction on June 30, 1965, (b) the Port changed reference in the said offer to acceptance prior to September 1, 1964, to acceptance prior to October 1, 1964, and (c) the Port confirmed in writing an oral agreement that "immediately following possession the Port may occupy and commence its planned demolition and reconstruction program on those portions of the terminal not occupied by the District Engineer." Mr. Crawford, author of the document containing the said confirmation, testified that reference to demolition and reconstruction was not

---

13. The terms and conditions added were captioned "Continuing Offer" (in effect making the Port's purchase offer firm and continuing for 90 days after defendant's receipt of the offer) and "Rescission" (authorizing defendant, *inter alia*, to rescind acceptance at any time during the "Continuing Offer" period of 90 days, should defendant reasonably determine such action to be justified "in light of the circumstances then prevailing").

14. Section 203(e) (3) as then in force provided that:

Disposals and contracts for disposal may be negotiated * * * without regard to paragraphs (1) and (2) of this subsection but subject to obtaining such competition as is feasible under the circumstances, if

* * * * *

(H) the disposal will be to States, * * * political subdivisions thereof, or tax-supported agencies therein, and the estimated fair market value of the property and other satisfactory terms of disposal are obtained by negotiation; * * *.

intended to refer to Pier 38, then closed and unsafe.

26. By letter dated September 9, 1964, to plaintiff, the Chief, Real Property Division, UDS, Region 10, advised that the Port's purchase offer "under the terms and conditions outlined in the above cited letters and Resolutions" had been accepted; that, provided the purchase price was paid, possession would be granted to the Port July 1, 1965; and that a draft of the proposed conveyance instruments would be submitted to the Port for approval when they had been prepared.

27. By letter dated September 10, 1964, the Chief, Real Property Division, UDS, Region 10, forwarded to the District Engineer, U. S. Army Engineer District, Seattle, a copy of defendant's acceptance of the Port's purchase offer, along with "copies of the pertinent documents leading to the sale." The District Engineer was advised that if he had any questions regarding provisions of the sale he should "feel free to call us."

28. (a) By letter dated May 11, 1965, to plaintiff's general manager, the Acting Deputy District Engineer, U. S. Army Engineer District, Seattle,[15] noted the "condition" contained in Section 3 of the Port Resolution (quoted in finding 19, *supra*); stated that leases on "Pier 38" and "Pier 39" each contained "the provision that the Government may effect termination by giving 30 days' notice in writing"; and added that "Although such notice may not be required in view of the cited condition in your offer as to termination of the leases, this letter will constitute that notice." Plaintiff's "concurrence" was requested. The Acting Deputy District Engineer's said letter further advised that shortly prior to June 30, 1965, defendant would present to the Port Supplemental Agreements to the said leases, which would, among other things, "Relieve the United States Government of all liabilities per-

taining to past use of the leased properties", and "Transfer title of all Government-owned improvements on the leaseholds to the Port", including "Pier 38 with Transit Shed (identified as Structure No. 1001), sprinkler system, all rail trackage and utilities existing thereon to which the United States has title (the Pier Apron is owned by the Port), [and] paved areas * * *."

(b) The Acting Deputy District Engineer's said letter of May 11, 1965, was written in response to an oral request by the Chief, Real Property Division, UDS, Region 10, that notices of termination of the said leases be given to the Port.

29. By letter dated May 21, 1965, the Army Engineer District, Seattle, forwarded to then counsel for the Port "drafts of Supplemental Agreements we will use in terminating the two leases * * * covering Piers 38 and 39 * *." The said letter, received by Port counsel May 24, 1965, was directed to him at the request of Mr. Crawford, who had been orally advised of preparation of the letter by the Army Engineer District. The proposed Supplemental Agreement to Lease W 7034 qm–63 provided in part that the lease should terminate at midnight June 25, 1965; that simultaneously with termination "all the improvements shown and listed below and which are now located in or upon the land and/or premises covered by this lease, as amended" would be transferred to the Port; and that the Port would discharge defendant from "any and all * * * liability and claims (except any unpaid rent for the period ending 25 June, 1965) against the Government * * * which the Lessor has * * * for the restoration of said premises or by reason of any other matter, cause or thing whatsoever particularly arising out of said lease and the occupation by the Government of the aforesaid premises." The proposed Supplemental Agreement to Lease No. W 45–108–ENG–2359 contained an identical release provision. The proposed Supple-

15. The leases on "Pier 38" and "Pier 39" were between the Port and defendant, acting through the Army Corps of En-

gineers, and the Corps of Engineers was the primary occupant of the Port of Embarkation during the period here material.

mental Agreements were never executed by the Port.

30. The record does not establish with any precision when the Port first became aware that defendant would not remove Pier 38, nor of the precise source of that awareness.[16] After conversations (not pinpointed in time) between representatives of the Port, GSA, and the Army Engineer District, concerning the real property transaction; the correspondence set forth in findings 28 and 29, *supra*; and, despite the approaching date of closing, an absence of any activity, or knowledge of activity, by defendant toward removing Pier 38, the Port was conscious, toward the latter part of May 1965, that if Pier 38 were to be removed, the Port would have to do it (or have it done).

31. The earliest documentary indication that the Port knew defendant would not remove Pier 38 (and, since its removal was an integral part of the Port's plans for development of the Port of Embarkation, that the Port itself would have to remove Pier 38) is an internal Port memorandum dated June 7, 1965, stating that a schedule of construction work on Pier 39 "should also be modified to include demolition of Pier 38 * * *."

32. A memorandum dated June 22, 1965,[17] from the then manager of plaintiff's Property Management Department to its general manager, which referred to the Acting Deputy District Engineer's letter of May 11, 1965, described in finding 28(a), *supra*, and the supplemental agreements described in finding 29, *supra*, stated in part that:

> After review Port Counsel advised us that no agreement of termination is required since [the Acting Deputy District Engineer's] letter of May 11, 1965 served to effect termination by giving 30 days' notice in writing.

Port legal counsel has prepared a proposed letter to the District Engineer, copy attached, informing him of Port Counsel's advice and calling attention to their responsibility under Supplemental Agreement #3 of the lease covering Pier 38.

It is requested that the Port Commission approve the transmittal of the attached letter by the General Manager to the District Engineer.

33. The minutes of the June 22, 1965, meeting of the Port Commission reflect in part that the Port Commission unanimously approved "the final legal description covering real and personal property to be acquired from the United States of America as heretofore authorized in Resolution No. 2168 and as subsequently corrected in the final Quit Claim Deed as submitted by the General Services Administration for use in closing the purchase agreement * * *."[18]

Following this paragraph is one reflecting that the Port Commission was advised of receipt of a letter

> * * * notifying the Port that the Corps of Engineers was terminating the * * * leases * * * on Piers 38 and 39. The letter * * * also indicated that a termination agreement would be prepared and submitted for the Port's signature. However, the matter has been reviewed with Port legal counsel and he has advised that no termination agreement is required. Further, in reviewing these leases, it has been noted that the Army has an obligation under the lease to remove Pier 38 following lease termination. * * *

The minutes next indicate that the Port general manager stated he had prepared a letter advising the District Engineer "the Port considers that no agreement of termination is required but that the

---

16. Mr. Crawford could not "specify a date."

17. In accordance with then common practice, the memorandum had in fact been prepared some days earlier. It superseded an earlier memorandum (also dated June

22, 1965) rewritten, at Mr. Crawford's instructions, because based on a factual misapprehension.

18. Compare finding 36(a), *infra*, and the remainder of the minutes of the meeting.

Port will look to the federal government for the removal of Pier 38 in accordance with the provisions in the lease", and that, if the Port Commission approved, he would forward the said letter to the District Engineer.

34. Pursuant to Port Commission approval, the Port general manager transmitted a letter dated June 22, 1965, to the Army District Engineer, with a copy to GSA, directing attention to defendant's lease obligation to remove Pier 38 "at any time prior to the expiration or termination of said lease", and adding that:

> Inasmuch as the lease of Pier 38 is now being terminated, we assume that the government will carry out its above specified obligation to remove the pier portion of Pier 38 at no cost or expense to the Port of Seattle. The lease specifies that such removal shall occur prior to the termination of the lease but the Port will have no objection to such removal * * * after * * * termination * * * provided it can be accomplished with reasonable promptness. * * * the Port * * * would be willing to negotiate any other satisfactory arrangements such as removal of the pier by the Port or its contractor so long as the Port is reimbursed for the anticipated cost of the removal.

The said letter was delivered (probably by hand delivery) to the District Engineer prior to closing on June 24, 1965.

35. A written communication bearing date of June 22, 1965, from the District Engineer, Seattle, to the United States Army Division Engineer, Portland, Oregon, states that discussions with GSA "reveal" several unresolved items in connection with the proposed sale to plaintiff, including "Lease Provisions for Removal of Pier 38." The Division Engineer was advised that GSA's position was that government acceptance of the Port's offer to purchase "terminated" both the "Pier 38" and "Pier 39" leaseholds and the government's obligation to remove Pier 38, and that the Port took the position that "while the leasehold

has been terminated, the affirmative obligation of the Government to remove Pier 38 is still existent." The District Engineer stated that there apparently remained an area of controversy which should be resolved prior to closure of the sale, and quoted Section 3 of Port Resolution No. 2167 (findings 19, 20, *supra*). The District Engineer (after discussing other matters not here relevant) concluded that the "above * * * are under active discussion with" Region 10, and that urgent action was required since GSA wanted to close the sale June 25, 1965.

36. (a) The closing of the transaction, as of 12:01 a. m., June 25, 1965, occurred on the afternoon of June 24, 1965. Defendant received the purchase price of $4,000,000, and tendered to plaintiff a deed quitclaiming to plaintiff, *inter alia*, "Government-owned improvements on the following described property: * * * *", followed by a legal description of the "Pier 39" leasehold and a legal description of the "Pier 38" leasehold, the latter as set forth in finding 3(e), *supra*.

(b) At closing each party knew (or clearly should have known) of the other's position with respect to removal of Pier 38, but neither party indicated any unwillingness to proceed with the closing with the disagreement unresolved. It is reasonable to infer that GSA was of the view that the Pier 38 removal obligation had been "terminated", and intended if necessary to stick to that position (as it has), and that the Port recognized defendant was not going to remove Pier 38 (indeed, the Port was then engaged in preparing to have Pier 38 demolished itself) but hoped (as it still does) that subsequently it could at least obtain reimbursement for the "cost of the removal."

37. (a) By letter dated June 24, 1965, the District Engineer advised the Regional Administrator, Region 10, in pertinent part that "the question raised in the Port's letter [of June 22, 1965 (finding 34, *supra*)] concerning the Government's obligation to remove Pier 38 * *

is * * * for resolution by your office in connection with your negotiations for the pending sale. We are so advising the Port * * *."

(b) Shortly thereafter, the Regional Administrator advised the District Engineer that the "offer to purchase by the Port * * * and the acceptance of that offer by the Government removes any obligation of the Government to remove Pier 38", and that the sale had been closed June 25, 1965, as scheduled.

38. (a) After advertising for bids on, and entering into a contract with General Construction Company at a total price of $358,649, covering both Pier 38 demolition and Pier 39 reconstruction, the Port proceeded to have Pier 38 demolished. While the record does not indicate precisely when the demolition of Pier 38 was completed, it was finished some time prior to completion of all work under General Construction Company's said contract with the Port on February 18, 1966.

(b) Under date of December 2, 1965, the Port submitted to defendant an invoice in the total amount of $63,668.44, for "Demolition costs of Pier 38 * * *". Components included demolition of Pier 38 and the transit shed thereon ($59,000); construction of a new handrail across the opening adjacent to Pier 38, and repair of an existing pipe rail ($500); furnishing timber at the job site for use as fender piles ($930.15); work on fender piles ($672.00); and 4.2 percent of the "Total contract cost" of $61,102.15, or $2,566.29, for "Washington State Sales Tax."

(c) By letter to plaintiff dated December 28, 1965, the Regional Administrator, Region 10, acknowledged receipt of the said invoice, and returned it to plaintiff with the statement that "This admin-

istration considers the offer to purchase by the Port of Seattle and acceptance of this offer by the Government removes any obligation on the part of the Government to remove Pier 38."

39. (a) General Construction Company's bid of $358,649 on both Pier 38 and Pier 39 work was the overall low bid received by plaintiff on the total contract work; one of the components of General's bid was $59,000 for Item A–1, "Demolition of Pier 38 to the west edge of the skirt apron including removal of all piling and demolition of the transit shed thereon." The Port did receive other bids higher overall than General's on the total contract work, but lower (the lowest $46,000) insofar as Item A–1 alone is concerned. The Port could not have accepted a bidder's quotation for Item A–1 alone.

(b) The record does not establish the actual cost of removal of Pier 38. From the record as a whole, the weight of the credible evidence is that the fair and reasonable cost of removing Pier 38 was $50,000.

## ULTIMATE FINDINGS AND CONCLUSIONS

■ 40. Under defendant's 1960 agreement with the Port, defendant had a plain, and unquestioned, obligation to remove Pier 38 prior to termination of the "Pier 38" lease.[19] The Port's 1964 purchase offer, authorized by the Port and containing a proposed $4,000,000 purchase price, also proposed that, simultaneously with the closing of the transaction, the leases between plaintiff and defendant on both the "Pier 38" and "Pier 39" leaseholds would be terminated "and *the improvements thereon shall be conveyed and transferred to the Port of Seattle.*" (Emphasis supplied).[20] That

---

19. By Supplemental Agreement No. 3 to the "Pier 38" lease, the Port transferred to defendant "the *Lessor-owned improvements* now situate on the premises described in said lease, as follows:
"A Pier, known as Pier 38 * * * and a one-story transit shed * * *."
In the same document, defendant agreed to remove "all of *the above* described and

transferred *improvements* known as the Pier portion only of Pier 38 * * * at any time prior to the expiration or termination of said lease." [Emphasis supplied].

20. The Port's purchase offer made specific reference to the "Pier 38" lease (finding 19, *supra*).

offer was accepted by defendant in September 1964.

41. While there may have been other "improvements" (*e. g.*, defendant's May 11, 1965, letter to plaintiff mentions the Pier, the transit shed, a sprinkler system, rail trackage, and utilities), the "improvements" on the "Pier 38" leasehold clearly included, and for all practical purposes consisted of, Pier 38, and the transit shed located thereon, transferred by the Port to defendant by Supplemental Agreement No. 3 in 1960.

42. Aside from the Port's Resolutions and offer, the record contains no evidence of either a conscious intent on the part of the Port to assume the burden of removing Pier 38 (and the transit shed thereon), or an intentional waiver by the Port of defendant's removal obligation. The contract resulting from defendant's acceptance of the Port's purchase offer is, however, plainly inconsistent with defendant's prior obligation, under Supplemental Agreement No. 3 to Lease W 7034 qm–63, to remove Pier 38, and must, therefore, be "interpreted as including an agreement to rescind the inconsistent term in the earlier contract." Restatement, Contracts § 408 (1932).

As Professor Corbin puts it (5A Corbin, Contracts § 1236, pp. 542, 544 (1964)):

   \* \* \* an operative agreement of rescission can be made tacitly as well as expressly. \* \* \*

When two parties make a new contract that is inconsistent with the terms of a previous one dealing with the same subject matter, it may be described as both a rescission and a discharge by substitution. \* \* \*

So it is here.[21] The agreement of the parties that, simultaneously with the closing of the transaction, the "Pier 38" lease would be terminated and "the improvements" on the leased premises transferred by defendant to plaintiff is inconsistent with defendant's theretofore existing obligation to remove such "improvements" at any time prior to termination of the lease, and effectively superseded it. *Ibid.*

43. Plaintiff urges that the $4,-000,000 purchase price exceeds defendant's "estimated fair market value" by some $49,000 (finding 22, *supra*) and that this discrepancy "would be compensated for" by "the Government's retaining of its financial burden of removing Pier 38 and the building thereon as established by Supplemental Agreement No. 3 \* \* \*." *Cf. finding 39.* Plaintiff also avers that shifting this financial obligation to the Port enlarges the discrepancy between estimated fair market value and purchase price, and asserts that Section 203(e) (3) (H) of the Act of June 30, 1949, *supra*, "required" that the sale be *at* "estimated fair market value." On a fair reading of Section 203(e) (3) (H), quoted *supra* (finding 23, note 14), plaintiff's naked assertion as to the meaning of the statute is an erroneous one. The argument that defendant *should not* "make a 'profit' on a sale to another governmental body within the United States" is not without some equitable appeal, but nothing in Section 203(e) (3) (H) prohibits defendant from disposing of its property to such a body at an agreed price in excess of "estimated fair market value."[22]

44. Plaintiff also contends that defendant's May 11 and May 21, 1965, letters to plaintiff (findings 28, 29, *supra*) constitute "contemporaneous and reason-

---

21. See also 6 Corbin, Contracts § 1293 (1962) ; 6 Williston, Contracts § 1836 (1938).

22. The "estimated fair market value" of $3,951,000 on which the argument is based was, parenthetically, as of June 30, 1963, not June 1965, when the closing took place.

able interpretations" that, absent execution by plaintiff of proposed Supplemental Agreement No. 4 to the "Pier 38" lease, defendant's Pier 38 removal obligation would remain. The doctrine plaintiff seeks to invoke is sound and settled law, but it has no application or relevance here. It cannot reasonably be concluded from the record that there was any acquiescence by defendant in plaintiff's interpretation of the transaction, or a recognition by defendant that, unless waived, the Pier 38 removal obligation would survive the closing. *Cf.* Jansen v. United States, 344 F.2d 363, 369, 170 Ct.Cl. 346, 355 (1965).

45. Plaintiff focuses on the quitclaim deed delivered to it June 24, 1965, (terming it, with respect to conveyance of "improvements", "a lawyers' provision, included for lawyers' reasons"), and asserts that it is not reasonably to "be construed as waiving by implication the clear and express obligation * * *" to remove Pier 38 imposed on defendant by Supplemental Agreement No. 3. This line of argument misses the mark entirely. The Port's offer, and defendant's acceptance thereof, constituted "an agreement for disposal between the offeror and the Government" and "the whole contract * * *" (finding 19, note 12, *supra*). That agreement, consummated by the formal instrument of transfer, was inconsistent with, and therefore amounted to rescission or discharge by substitution of, defendant's theretofore existing removal obligation, and defendant breached no obligation to plaintiff in failing to remove Pier 38. *Cf.* Wender Presses, Inc. v. United States, 343 F.2d 961, 170 Ct.Cl. 483 (1965).

## CONCLUSION OF LAW

Upon the foregoing findings of fact and conclusions of law which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.

