508 F.2d 687
 9 Fair Empl.Prac.Cas. 117, 9 Empl. Prac. Dec. P 9923
 JERSEY CENTRAL POWER & LIGHT CO., Appellee,
v.
LOCAL UNIONS 327, 749, 1289, 1298, 1303, 1309 AND 1314 OF
the INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, et al., Appellants.
 
 No. 74-2016.
 United States Court of Appeals, Third Circuit.
 Argued Nov. 15, 1974.
Decided Jan. 30, 1975, As Amended Feb. 14, 1975, Rehearing
and Rehearing In Banc Denied March 4, 1975.*
*Judge Gibbons would grant rehearing in banc.
 Vincent J. Apruzzese, Maurice J. Nelligan, Jr., Trenton, N.J., Apruzzese & McDermott, Springfield, N.J., for appellee.
 Edward A. Cohen, Franzblau, Cohen & Falkin, Newark, N.J., for appellants.
 William A. Carey, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg, Charles L. Reischel, Lutz Alexander Prager, Washington Marshall, Washington, D.C., for the United States Equal Employment Opportunity Commission.
 Denis F. Gordon, David L. Rose, Terence G. Connor, Cynthia L. Attwood, U.S. Dept. of Justice, Washington, D.C., for the United States Office of Federal Contract Compliance and General Services Adm.
 Ira C. Miller, Pellettieri & Rabstein, Trenton, N.J., for amicus curiae New Jersey State AFL-CIO.
 Appeal from the Order of the United States District Court for the District of New Jersey, Civil Action No. 74-1083.
 Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This case presents to us, in an unusual procedural context, the difficult question of determining which of two allegedly conflicting contracts is to dictate the plaintiff employer's course of conduct. We must resolve whether in reducing a company's work force an employer is obligated to adhere to collective bargaining agreement provisions requiring layoffs in reverse order of seniority, or whether the employer is obligated to implement the provisions of a conciliation agreement made with the Equal Employment Opportunity Commission (EEOC) to retain among its employees a larger proportion of minority group and female workers. It is agreed among the parties that layoffs in reverse order of seniority will have a disproportionate effect upon minority group and female workers, as they are the most recently hired employees. Despite this consequence, we reverse the judgment of the district court and hold that the provisions of the collective bargaining agreement must govern in this procedural context.
 
 I.A. Procedural History
 
 2
 On July 18, 1974, Jersey Central Power & Light Company ('Company'), the employer, brought the instant action pursuant to 28 U.S.C. 2201, 2202[1] in the District Court for the District of New Jersey. The Company sought a judgment declaring its rights and obligations under: (1) a collective bargaining agreement between the Company and the Unions,[2] and (2) a conciliation agreement among the EEOC, the Company and the Unions.[3] Named as defendants in the action for declaratory judgment were the Unions, the EEOC, the United States Office of Federal Contract Compliance (OFCC), the United States General Services Administration (GSA), and the New Jersey Division of Civil Rights.[4] The Company presented itself in this litigation as a 'neutral' party, taking no position as to which of the two contracts must govern the manner by which a substantial cutback in employment would be effectuated.[5] In this posture, the Company sought guidance from the district court, asserting that economic circumstances required it to lay off substantial numbers of employees. The Company alleged that it could not determine the specific individuals to be affected until the court declared which of the two agreements was to govern the layoff procedure.
 
 
 3
 Contending that it faced multiple suits for back pay, irreparable injury to itself and to the public, and severe financial inroads on its resources, on August 23, 1974, the Company moved for an order requiring the defendants to show cause why summary judgment should not be granted 'declaring the respective rights of the parties and whether plaintiff (the Company) violated its collective bargaining agreement with (the Union) defendants . .. and the Conciliation Agreement entered into on December 3, 1973 by the layoff . . . of (designated) employees . . ..'[6]
 
 
 4
 On September 5, 1974, the return date of the order to show cause, defendants GSA and OFCC moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12 for failure of the complaint to state a claim upon which relief could be granted and for lack of subject matter jurisdiction in the federal district court. Defendant EEOC, in turn, did not contest the district court's jurisdiction but instead opposed the Company's motion on the grounds that summary judgment could not be granted because material facts were in dispute.[7] After the submission of briefs and affidavits, the district court held a hearing on motions of the Company and GSA and OFCC, at the conclusion of which the court rendered an oral opinion.[8] The district court denied the motion to dismiss brought by GSA and OFCC[9] and granted partial summary judgment, requiring the Company to lay off employees in a manner inconsistent with the collective bargaining agreement to avoid a reduction in the percentage of females and minority group members in the work force. As such, the district court rejected the Unions' contentions that the collective bargaining provisions (layoff by reverse order of seniority) were to control without modification.
 
 
 5
 In particular, the district court's order required that: (1) the seniority provisions of the collective bargaining agreement could not be construed in such a manner as to frustrate the purpose of the conciliation agreement (to wit: that at the end of five years females and minority group members would constitute a proportion of the Company's work force which would approximate the proportion of those groups in the relevant labor market);[10] (2) the provisions of the conciliation agreement were to prevail over the provisions of the collective bargaining agreement to the extent that the two agreements were in conflict; and (3) layoffs were to be accomplished in such a manner so that upon completion, the minority group and female worker ratios would be the same as those existing as of July 27, 1974, (approximately one month prior to the commencement of layoffs).
 
 
 6
 The district court granted leave to file an interlocutory appeal pursuant to 28 U.S.C. 1292(b). Pursuant thereto the defendant Unions applied for leave to appeal and a panel of this Court granted such leave10A on October 9, 1974, at the same time staying the district court's order and expediting appeal.[11] Prior to the hearing on November 15, 1974, defendant-appellee EEOC moved to vacate the October 9, 1974 stay. That motion was denied.[12]
 
 I.B. Facts[13]
 
 7
 The Company is a large public utility operating in New Jersey and engaged in the generation and distribution of electrical power throughout approximately half of that State. As of June 29, 1974, the Company employed 3,859 employees, of whom 2,877 were in the bargaining units represented by the Unions involved in the instant proceeding.
 
 
 8
 On January 28, 1972, a charge had been filed with the EEOC alleging that the Company and the Unions unlawfully discriminated against women and 'minority group persons,'[14] in violation of Title VII of the Civil Rights Act of 1964. The EEOC investigated the charge and found[15] reasonable cause to believe that the Company discriminated against minority group persons and females with respect to hiring and job assignments.[16] Thereafter, a conciliation agreement was entered into among the Company, EEOC, and the Unions. The conciliation agreement was signed in January, 1974, to be effective from December 3, 1973 through December 3, 1977. The agreement was divided into several sections. Section I-- 'General Provisions'-- provides, inter alia:
 
 
 9
 1. It is understood that this Agreement does not constitute an admission by the Respondents of any violation of Title VII of the Civil Rights Act of 1964, as amended.
 
 
 10
 3. The Commission agrees not to sue the Respondents over matters contained in this Agreement subject to Respondent's compliance with the promises and representations contained herein. If the Commission believes that this Agreement has been violated, it shall first attempt to resolve the dispute with the parties; then if no Agreement can be reached, the Commission can seek to enforce this Agreement through the legal process.
 
 
 11
 4. This waiver by the Commission extends to any matter which is covered by this Agreement. This does not preclude individual Charging Parties, or the Commission itself, from filing charges or suit over new matters or practices which may arise with respect to practices of the Respondents.
 
 
 12
 5. Respondents agree that all hiring and promotion practices, and any and all other conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, creed, ancestry, religion, sex, national origin, age, place of birth, marital status or liability for services in the armed forces of the United States in violation of Title VII of the Civil Rights Act of 1964, as amended.
 
 
 13
 Section III of the conciliation agreement ('Recruitment and Hiring Practices') Paragraph 9, obligates the Company to make reasonable efforts to 'recruit minorities and females into those craft areas where such jobs are to be filled by new hires, where they have heretofore been under utilized or not employed.' Paragraph 10 provides that the minority group persons and female recruits for craft jobs are to be given credit for experience gained in the craft with other employers and may be considered for jobs other than those at the entry level. Paragraph 10 concludes that:
 
 
 14
 The wages, benefits, other conditions of employment and seniority date of such employee shall be determined in accordance with the provisions of the Collective Bargaining Agreement.
 
 
 15
 Section IV of the conciliation agreement is entitled 'Promotion and Transfer' and establishes a special program for female and minority group Company employees who are to be given preference for promotions and transfers into vacant positions on the basis of their company seniority.[17] Paragraph 2 specifically provides: 'For purposes of this Conciliation Agreement vacancies occasioned by layoff . . . shall not be considered as vacancies.'
 
 
 16
 Section V ('Affirmative Action') establishes a five year affirmative action program designed to increase the percentage of minority group and female employees.[18] Among other provisions, the agreement also provides for reporting (Section IX), a modification of the maternity leave policy (Section VI) and certain payments by the Company to employees and others for past discriminatory practices. (Section VII).[19]
 
 
 17
 The conciliation agreement has no express seniority provision nor does it expressly modify or alter the seniority provisions found in the collective bargaining agreement.[20] Rather, a fair reading of the conciliation agreement reveals that it is primarily concerned with the hiring, promotion and transfer of female and minority group employees.
 
 
 18
 On December 3, 1973, prior to the execution of the conciliation agreement by the Company, the Unions and EEOC, the Company and the Unions entered into a new collective bargaining agreement effective from November 1, 1973 through October 31, 1975. In pertinent part the collective bargaining agreement continues the seniority policies in operation among the bargaining unit employees of the Company.[21] In regard to layoffs, the collective bargaining agreement provides inter alia:
 
 
 19
 3.2. (a) All layoffs, or demotions occasioned because of falling off or curtailment of work, shall be discussed with the Union two (2) weeks in advance of the layoff and shall be made in order of seniority. No senior employee shall be laid off as long as any work which he can reasonably be expected to do is being performed by an employee junior in point of service.
 
 
 20
 3.3. Employees who have been laid off shall be reinstated to employment as need for their services arises, in the reverse order of their layoff.
 
 
 21
 3.4. Seniority is defined as length of continuous service with the Company . . ..
 
 
 22
 These provisions establish a plant-wide seniority system[22] for employees with respect to layoffs.[23]
 
 
 23
 The Company in its pleadings asserts that economic considerations compelled it to announce a layoff of employees in July, 1974. The Company estimates that approximately 400 employees will have been laid off by mid-December, 1974. The Unions required strict adherence by the Company to the seniority provisions of the collective bargaining agreement. The EEOC responded to the Company's layoff plans by indicating that a layoff accomplished by seniority alone would violate the provisions of the conciliation agreement and Title VII of the Civil Rights Act of 1964.[24]
 
 
 24
 Confronted with two apparently conflicting contracts, the Company instituted this action for declaratory judgment. At about the same time, the Company and the Unions submitted to an expedited arbitration proceeding under their collective bargaining agreement to determine if a layoff of employees in reverse order of seniority would violate the nondiscrimination provision of the collective bargaining agreement.[25] On August 21, 1974, the arbitrator held that a layoff in accordance with the seniority provisions of the collective bargaining agreement would not violate the non-discrimination provision of the same document.[26]
 
 
 25
 In accordance with the arbitrator's award, on August 23, 1974, the Company commenced the layoff in reverse order of seniority. Layoffs in this manner continued until September 5, 1974 when the district court issued its opinion which, as previously noted, required accommodation with the conciliation agreement.
 
 
 26
 After the first week of layoffs, statistics provided by the Company indicated that the layoffs had a disproportionate impact upon minority group employment.[27] As of August 30, 1974, one hundred seventy-six (176) employees were identified for layoff or termination, of which 30.7% Or 54, were male or female minority group persons. As a result of this first group of bargaining unit employees being laid off, the percentage of male and female minority group employees in the bargaining unit decreased from 7.9% On July 27, 1974 to 6.4% As of August 30, 1974.[28] With respect to female employees only, however, the initial layoff had no disparate impact. Both before and after the layoff, women constituted 14.6% Of the total workforce and 15.2% Of the bargaining unit.[29]
 
 
 27
 Subsequent to the district court's opinion announced on September 5, 1974, the Company began to program the remainder of its layoffs to comply with the district court's directive that the female and minority group employee ratios existing as of July 27, 1974 be maintained throughout the layoff process. The Company continued layoffs pursuant to the district court's directive until October 9, 1974, at which time this Court granted a motion to stay the order of the district court. Since October 9, 1974 the Company has reverted to laying off employees solely by reverse order of seniority.
 
 II. Jurisdiction
 
 28
 We need not make any detailed inquiry into the threshold question of jurisdiction.[30] We are satisfied that the pleadings and the record establish the requisite jurisdiction. The complaint, among other jurisdictional allegations,[31] predicates jurisdiction on 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. 185(a). We agree that in seeking a declaratory judgment as to its collective bargaining agreement with the Unions, the Company has properly invoked our jurisdiction.[32] Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 561-562, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968); see also Serio v. Liss, 300 F.2d 386 (3d Cir. 1961).
 
 
 29
 We also believe that jurisdiction has been properly invoked with respect to those issues involving the conciliation agreement and the EEOC. In our opinion, inasmuch as the EEOC agreement must be interpreted according to federal substantive law, see United States v. Seckinger, 397 U.S. 203, 209-210, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), the Company's cause of action joining EEOC 'arises under' laws of the United States within the meaning of 28 U.S.C. 1331.[33] See Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Ivy Broadcasting Co. v. American Tel. & Tel. Co., 391 F.2d 486, 492 (2d Cir. 1968). We are also satisfied that even if there were no independent ground of jurisdiction existing under 1331,[34] that nonetheless there exists jurisdiction ancillary to the proper resolution of the Company's cause of action based upon the collective bargaining agreement. See Rosado v. Wyman, 397 U.S. 397, 405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Almenares v. Wyman, 453 F.2d 1075, 1083 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972).
 
 
 30
 As we have previously indicated, see n. 5 supra, the Company's action for declaratory judgment presents a justiciable case or controversy, as indeed it must, under Article III of the Constitution. E.g., Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). A case or controversy in the constitutional sense 'must be definite and concrete, touching the legal relations of parties having adverse legal interests.' Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937); see also Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). A dispute is not too hypothetical for the proper exercise of federal jurisdiction if there is present an immediate adverse effect on the parties in a concrete situation. See Longshoremen's Union v. Boyd, 347 U.S. 222, 223-224, 74 S.Ct. 447, 98 L.Ed. 650 (1954). Moreover, in determining whether a dispute has matured to the point at which the judicial function may be properly exercised, a court may look to the announced intentions of the defendants to take adverse action against the plaintiff. Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[35] In this regard, the defendants here have announced their intention to require Company compliance with each particular contract, although the Company implicitly challenges (albeit inconsistently) each party's respective interpretations.[36] Thus in our view, there exists a justiciable case or controversy. See Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1964, 40 L.Ed.2d 1 (1974); cf. National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.,2d 689 (1971).
 
 III. Contract Theory
 
 31
 The district court, viewing the instant proceeding as one requiring the interpretation of contracts only, specifically refused to consider the issue of past employment practices of either the Company or the Unions. Although we agree with the district court that the instant controversy must be analyzed according to the principles of general contract law, see United States, v. Seckinger, 397 U.S. at 210, 90 S.Ct. 880; Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947), we must nevertheless differ with that court's interpretations of the two contracts and, as such, with its issuance of the judgment predicated upon those interpretations.[37]
 
 
 32
 In interpreting the two contracts before us, we must: first, determine whether or not an express or implied conflict exists as between the provisions of the conciliation agreement and the provisions of the collective bargaining agreement, and, if such a conflict does exist, which of the two contracts is to govern; second, if no such conflict is held to exist, determine if the collective bargaining agreement must nevertheless be modified to accommodate an overriding public policy. The district court followed a similar approach concluding (1) that to the extent that the conciliation agreement conflicts with the collective bargaining agreement, the conciliation agreement prevails; and (2) that the layoffs are not to be accomplished in the manner prescribed by seniority clauses of the collective bargaining agreement, because such a method of layoffs would 'frustrate' the objective of the conciliation agreement. We hold both conclusions of the district court to be erroneous as a matter of law.
 
 A. The Two Contracts Do Not Conflict
 
 33
 In our interpretation of both contracts we are governed solely by federal law.[38] After comparing and contrasting the provisions of the two contracts, we are of the view that no conflict exists with respect to layoffs.
 
 
 34
 The conciliation agreement has, as its objective, the percentage increase of females and minority group persons among employees. This objective was to be attained by the company hiring a greater percontage of minority group and female workers-- not by resort to a system of 'artificial' seniority. See note 20, supra. As such the conciliation agreement sought an increase in the proportion of female and minority group workers by 'hires' and not by 'fires.' It is highly significant to us that the conciliation agreement contains no overall layoff procedure or seniority system. Moreover, the express terms of the conciliation agreement do not attempt to affect, nor can we interpret them to affect, the layoff provisions of the collective bargaining agreement.[39]
 
 
 35
 The 'new hire' method of attaining a higher proportion of female and minority group workers is evident throughout the conciliation agreement. In particular, reference to 'new hires' is made in Section III, paragraph 9 of the conciliation agreement, which provides:
 
 
 36
 Respondent Company shall make a reasonable effort to recruit minorities and females into those craft areas where such jobs are to be filled by new hires, where they have heretofore been underutilized or not employed. To this end, Respondent Company agrees that in each instance where a job is not to be filled from within, pursuant to the Collective Bargaining Agreement and practices thereunder, reasonable efforts will be made to secure a minority or female as outlined in paragraph 1 of the Affirmative Action portion of this Agreement.[40]
 
 
 37
 Paragraph 1 of the Affirmative Action program, in turn, is confined solely to 'new hire' situations:
 
 
 38
 Respondent Company is presently undergoing its utilization analysis for preparation of its goals and time tables. The Company agrees to make every reasonable effort to bring its minority and female workforce up to parity by location and EEO-1 categories as openings for new hires occur and qualified applicants are available within five (5) years.[41]
 
 
 39
 We regard the conciliation agreement as unambiguous in its requirements that an increased proportion of females and minority group persons be hired, but that once hired, workers in these classes be controlled by the terms and conditions of employment as set forth in the collective bargaining agreement. Accordingly, we read the conciliation agreement as not modifying the promotion, transfer or layoff practices established by the collective bargaining agreement once females and minority group persons have been employed. We base this interpretation, in part, on two provisions of the conciliation agreement. As previously noted, in regard to recruitment and hiring practices, section III, paragraph 10, provides:
 
 
 40
 The wages, benefits, other conditions of employment and seniority date of such employee shall be determined in accordance with the provisions of the Collective Bargaining Agreement.
 
 
 41
 Moreover, in the context of promotions and transfer practices, section IV, paragraph 2, in pertinent part provides:
 
 
 42
 'Those male minorities/females who are qualified and who had indicated the disire to transfer shall be given the opportunity to transfer, using their total length of Company service, subject to vacancies being available and in a manner consistent with the current Collective Bargaining Agreement. For purposes of this conciliation Agreement vacancies occasioned by layoff . . . shall not be considered as vacancies.[42]
 
 
 43
 We thus interpret the conciliation agreement as being consistent with, rather than in conflict with, the collective bargaining agreement, in that it incorporates the Company seniority system.
 
 
 44
 EEOC alternatively argues that if not an express, at least an implicit inconsistency exists between the two agreements and that this inconsistency requires a modification of the seniority provisions of the collective bargaining agreement. For EEOC's argument to succeed, it must persuade us that despite the silence of the conciliation agreement respecting overall seniority, we should nonetheless interpret the two contracts as being inconsistent.
 
 
 45
 First, EEOC contends that where the subject matter is the same in two contracts but the contracts contain terms inconsistent with each other, the later agreement will supersede the earlier agreement.[43] Second, EEOC contends that the Company's agreement to use 'best efforts' to have its work force reflect the racial, ethnic and sex composition in the relevant labor market should be given effect as an implicit modification of the seniority provisions. Third, EEOC argues that the objectives of the conciliation agreement (to increase the proportion of female and minority group workers) will be thwarted if effect is given to the seniority provisions of the collective bargaining agreement.
 
 
 46
 We cannot agree with EEOC's arguments. First, whether or not a subsequent contract is deemed to supersede an earlier contract is a question of the parties' intent to be ascertained from the contracts themselves when they are unambiguous. In order for us to hold that the parties intended the second agreement (here the conciliation agreement) to operate as a substituted contract, the terms of the second contract must be so inconsistent with those of the first that both contracts cannot stand together.[44] Here, we can discern no such intent as the conciliation agreement is completely silent on the issue of overall seniority. Hence, despite its later execution we find no inconsistency, apparent or otherwise, between the two contracts. Accordingly, there is no basis to preclude our sustaining both contracts in full.[45] See Rosenberg v. D. Kaltman & Co. Inc., 28 N.J.Super. 459, 101 A.2d 94 (1953); compare N.L.R.B. v. Operating Engineers Local 12, 323 F.2d 545, 548 (9th Cir. 1963); Port of Seattle v. United States, 450 F.2d 1363, 1378 (Ct.Cl.1971).
 
 
 47
 Second, the conciliation agreement, section III (Recruitment and Hiring Practices) and V. (Affirmative Action Program), requires the Company to use 'best efforts' to increase the percentage of female and minority group employees. We do not believe that this undertaking by the Company necessarily modifies by implication a seniority system of layoffs. We interpret the 'best efforts' commitment in a context that requires the Company to use its 'best efforts' to increase the female and minority group proportion among employees as openings for new hires arise. This is completely consistent with the express terms of the conciliation agreement (see infra). Third, with respect to the objective which EEOC claims is defeated if effect is given to the collective bargaining agreement, we believe EEOC has only partially stated the objective of that agreement. As our analysis reveals, the true objective of the conciliation agreement is to increase the percentage of female and minority group employees through 'new hires' only. The express language of the conciliation agreement so provides:
 
 
 48
 'The Company agrees to make every reasonable effort to bring its minority and female work force up to parity . . . as openings for new hires occur and qualified applicants are available within five (5) years.' Section V, paragraph 1. We thus do not agree with EEOC or with the district court that layoffs by reverse order of seniority would unlawfully frustrate this objective.[46]
 
 
 49
 Hence, we conclude that the two agreements are not in conflict either by their express terms or by implication. We are obliged, nonetheless, to proceed to the question of whether an overriding public policy dictates a modification of the collective bargaining agreement.
 
 B. Public Policy
 
 50
 The district court emphasized that the principal purpose of the conciliation agreement between the Company, the Unions and EEOC was to ensure that at the end of five years the proportion of females and minority group employees would approximate the proportion of those groups in the relevant labor market. The primary basis for the district court's modification of the collective bargaining agreement was the district court's conclusion that insistence on layoff solely according to the collective bargaining agreement would frustrate[47] the purposes of the conciliation agreement.
 
 
 51
 As our analysis indicates, the district court's conclusion in this respect is without merit. Consequently, we now believe the appropriate inquiry is whether a seniority clause providing for layoffs by reverse order of seniority must be modified as being contrary to public policy and welfare. Cf. Restatement, Contracts, 369, at 671 (1932).
 
 
 52
 In order to declare the provisions of the collective bargaining agreement (entered into by the parties freely and without evidence of fraud) void as against public policy, the contract terms must be invalid on the basis of clear and distinct legal principles. The Supreme Court has stated:
 
 
 53
 . . . As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy . . .. Only dominant public policy would justify (invalidating contracts) . . ..
 
 
 54
 Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945). Pursuant to this principle, public policy of the United States in general, is to be determined from a consideration of the Constitution, treaties, federal statutes and applicable legal precedents. See Hurd v. Hodge, 334 U.S. 24, 34-36, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Muschany, 324 U.S. at 66, 65 S.Ct. 442; St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U.S. 650, 655, 19 S.Ct. 61, 43 L.Ed. 320 (1898). In the case sub judice we are not without legislative guidance in ascertaining the public policy applicable to the particular situation here presented. Title VII of the Civil Rights Act of 1964 provides Congress' formulation of public policy. Cf. Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 357, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). By Title VII, Congress in the context of employment discrimination supplanted with its own views any judicial determination of public policy.[48] Cf. United States v. Atlantic Mutual Ins. Co., 343 U.S. 236, 245, 72 S.Ct. 666, 96 L.Ed. 907 (1952) (Frankfurter, J., dissenting).
 
 
 55
 Our reading of Title VII reveals no statutory proscription of plant-wide seniority systems. To the contrary, Title VII authorizes the use of 'bona fide' seniority systems:
 
 
 56
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply dirrerent standards of compensation, or different terms, conditions or privileges of employment pursuant to a bona fide seniority or merit system . . ..
 
 
 57
 42 U.S.C. 2000e-2(h). Moreover, we can discern no '. . . definite indications . . . to justify the invalidation of (such) a contract as contrary to that (public) policy.' Muschany, 324 U.S. at 66, 65 S.Ct. at 451.[49] While the legislative history of Title VII is largely uninstructive with respect to seniority rights, it is evident to us that Congress did not intend that a per se violation of the Act occur whenever females and minority group persons are disadvantaged by reverse seniority layoffs.[50] See United States v. Jacksonville Terminal Co., 451 F.2d 418, 445 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).
 
 
 58
 Accordingly, we hold that a seniority clause providing for layoffs by reverse order of seniority is not contrary to public policy and welfare and consequently is not subject to modification by court decree.
 
 IV. Evidentiary Considerations
 
 59
 To this point we have concluded that: (1) the seniority provisions of the Company's collective bargaining agreement are not inconsistent with any provision of the conciliation agreement; and (2) the seniority provisions do not offend public policy.
 
 
 60
 There remains for our consideration the effect that evidence of discrimination may have upon laying off workers in reverse order of seniority. We turn to evidentiary considerations at this juncture because: (1) evidence appears in the record indicating disparate impact on the employment of female and minority group workers,[51] cf. Western Addition Community Organ. v. N.L.R.B., 485 F.2d 917 (D.C.Cir. 1973), cert. granted,415 U.S. 913, 94 S.Ct. 1487, 39 L.Ed.2d 446 (1974); and (2) we are obliged to furnish directions to the district court with respect to evidence, if any, it may receive concerning those issues which remain for resolution.
 
 
 61
 Consequently we must answer the following questions: (1) what evidence, if any, may be adduced in the district court; (2) to what issue is such evidence to be directed? Depending upon the answers to the preceding questions, the ultimate question in this proceeding becomes: assuming, arguendo, evidence of past discrimination, is judicial modification permitted of facially neutral plantwide seniority provisions where these provisions operate to the disadvantage of female and minority group workers?
 
 
 62
 We are not concerned here with allegations or proof that the Company's plant-wide seniority system is by its express terms and intent presently discriminatory. Nor are we concerned with any charges or proofs that this plant-wide seniority system, which is facially neutral, was intended and designed to disguise present discriminatory practices.[52] The only challenge to the validity of the Company's plant-wide seniority system is that the seniority system, although facially neutral, nevertheless violates Title VII in that it operates to carry forward the effect of prior acts of discrimination. If evidence were to be permitted in support of such a theory, see Watkins, supra note 48, it could, at best, demonstrate that past discrimination occurred, and that the effects of such past discrimination are perpetuated by the present layoff practices under the current plantwide seniority system. As we explain below, proofs of this nature are without probative value in challenging a bona fide seniority system. We believe that Congress intended to bar proof of the 'perpetuating' effect of a plant-wide seniority system as it regarded such systems as 'bona fide'.[53] Congress, while recognizing that a bona fide seniority system might well perpetuate past discriminatory practices, nevertheless chose between upsetting all collective bargaining agreements with such provisions and permitting them despite the perpetuating effect that they might have. We believe that Congress intended a plantwide seniority system, facially neutral but having a disproportionate impact on female and minority group workers, to be a bona fide seniority system within the meaning of 703(h) of the Act.
 
 
 63
 To effectuate this intent, the only evidence probative in a challenge to a plant-wide seniority system would be evidence directed to its bona fide character; that is, evidence directed either to the neutrality of the seniority system or evidence directed to ascertaining an intent or disign to disguise discrimination.[54] As such, it is not fatal that the seniority system continues the effect of past employment discrimination. We believe this result was recognized and left undisturbed by Congress in its enactment of 703(h) and (j).[55] Although the Congressional statements which we set out were made prior to the adoption of the Act in its final form and therefore were not addressed to the explicit language of 703(h), these statements nonetheless were directed to the effect of seniority systems with which 703(h) is concerned. As such, we believe they are of primary assistance in interpreting congressional intent as to seniority systems.[56]
 
 
 64
 The Interpretive Memorandum of Senators Clark and Case, floor managers for the Title VII bill in the Senate, in pertinent part provided:
 
 
 65
 Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged-- or indeed, permitted-- to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier. (However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes effect may be held an unlawful subterfuge to accomplish discrimination.) 110 Cong.Rec. 7213 (April 8, 1964). This interpretation of the interaction of Title VII with the 'last hired, first fired' principle of employment seniority was repeated in Senator Clark's response to written questions posed by Senator Dirksen:
 
 
 66
 Question. Would the same situation prevail in respect to promotions, when that management function is governed by a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for 'last hired, first fired.' If the last hired are Negroes, is the employer discriminating if his contract requires that they be first fired and the remaining employees are white?
 
 
 67
 Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be the 'last hired,' he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because of his race.
 
 
 68
 Question. If an employer is directed to abolish his employment list because of discrimination what happens to seniority?
 
 
 69
 Answer. The bill is not retroactive, and it will not require an employer to change existing seniority lists.
 
 
 70
 110 Cong.Rec. 7217 (April 8, 1964). See also id. at 6996 (April 6, 1964). Moreover, a memorandum from the Department of Justice presented by Senator Clark similarly interpreted the legislation's effect upon layoffs made pursuant to a system of reverse order of seniority:
 
 
 71
 Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by title VII. This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes. Title VII is directed at discrimination based on race, color, religion, sex or national origin. It is perfectly clear that when a worker is laid off or denied a chance for promotion because under established seniority rules he is low man on the totem pole he is not being discriminated against because of his race. Of course, if the seniority rule itself is discriminatory, it would be unlawful under Title VII. If a rule were to state that all Negroes must be laid off before any white man, such a rule could not serve as the basis for a discharge subsequent to the effective date of the title . . .. But, in the ordinary case, assuming that seniority were built up over a period of time during which Negroes were not hired, these rights would not be set aside by the taking effect of Title VII . .. Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title. 110 Cong.Rec. 7207 (April 8, 1964).
 
 
 72
 Our interpretation of the legislative history of Title VII (i.e., that Congress did not intend the chaotic consequences that would result from declaring unlawful all seniority systems which may disadvantage females and minority group persons, see, e.g., United States v. Jacksonville Terminal Co., 451 F.2d at 445,) has been adopted by other courts as well. The Fifth and Seventh Circuits agree with our view of the legislative history even though they considered this question in the more traditional procedural context of a Title VII proceeding.[57] In Waters v. Wisconsin Steel Works, 502 F.2d 1309 (7th Cir. 1974), the Seventh Circuit stated:
 
 
 73
 An employment seniority system embodying the 'last hired, first fired' principle does not of itself perpetuate past discrimination. To hold otherwise would be tantamount to shackling white employees with a burden of a past discrimination created not by them but by their employer. Title VII was not designed to nurture such reverse discriminatory preferences. Griggs v. Duke Power Co., 401 U.S. 424, 430-431 (91 S.Ct. 849, 28 L.Ed.2d 158) (1971). 502 F.2d at 1320. In Papermakers local 189 v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), the Fifth Circuit reasoned:
 
 
 74
 No doubt, Congress, to prevent 'reverse discrimination' meant to protect certain seniority rights that could not have existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but after his original rejection, even though the Negro might have had senior status but for the past discrimination. As the court pointed out in Quarles, (Quarles v. Phillip Morris, 279 F.Supp. 505, E.D.Va.) the treatment of 'job' or 'department seniority' raises problems different from those discussed in the Senate debates: 'a department seniority system that has its genesis in racial discrimination is not a bona fide seniority system.' 279 F.Supp. at 517
 
 
 75
 It is one thing for legislation to require the creation of fictional seniority for newly hired Negroes, and quite another thing for it to require that time actually worked in Negro jobs be given equal status with time worked in white jobs. To begin with, requiring employers to correct their pre-Act discrimination by creating fictional seniority for new Negro employees would not necessarily aid the actual victims of the previous discrimination. There would be no guaranty that the new employees had actually suffered exclusion at the hands of the employer in the past, or, if they had, there would be no way of knowing whether, after being hired, they would have continued to work for the same employer. In other words, creating fictional employment time for newlyhired Negroes would comprise preferential rather than remedial treatment. The clear Thrust of the Senate debate is directed against such preferential treatment on the basis of race. That sentiment was codified in an important portion of Title VII, 703(j):
 
 
 76
 '(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in Any apprenticeship or other training program, in comparison with the total number of percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.' 42 U.S.C. 2000e-2(j) . . ..
 
 
 77
 We conclude, in agreement with Quarles, that Congress exempted from the anti-discrimination requirements only those seniority rights that gave white workers preference over junior Negroes. This is not to say that Whitfield (Whitfield v. United States Steelworkers, Local 2708, 5 Cir., 263 F.2d 546) and Quarles and Title VII prohibit an employer from giving compensatory training and help to the Negro workers who have been discriminated against. Title VII's imposition of an affirmative duty on employers to undo past discrimination permits compensatory action for those who have suffered from prior discrimination. Papermakers Local 189, 416 F.2d at 994-995.
 
 
 78
 We thus conclude in light of the legislative history that on balance a facially neutral company-wide seniority system, without more, is a bona fide seniority system and will be sustained even though it may operate to the disadvantage of females and minority groups as a result of past employment practices. If a remedy is to be provided alleviating the effects of past discrimination perpetuated by layoffs in reverse order of seniority, we believe such remedy must be prescribed by the legislature and not by judicial decree.
 
 
 79
 Having reached this conclusion our analysis is complete. Here, with the meager record before us and considering the manner in which the issues are framed, we need not, and indeed could not, decide whether any different result would obtain in an action brought by an aggrieved party[58] were the requisite burden of proof sustained. See note 54, supra; and generally Alexander v. Gardner-Denver Co., supra. What we decide here can obviously affect and bind only the parties present in this litigation. Of the parties before us, none has offered evidence to prove that the seniority provisions are not bona fide.
 
 
 80
 Having ascertained no basis in the record, or as a matter of law, to sustain the partial summary judgment order of September 23, 1974 as it pertains to the subject of layoffs, we will remand to the district court with directions: (1) to vacate so much of the September 23, 1974 order as is inconsistent with this opinion; and (2) to conduct such further proceedings not inconsistent with this opinion as may thereafter be required.
 
 
 81
 Each party will bear its own costs.
 
 
 82
 Hiring Hiring
 Min. % Rate % Fem. % Rate %
 ------ ------ ------ ------
Officials & Managers 3.0 5.0 5.0 8.0
Professionals 5.0 8.0 5.0 8.0
Technicians 6.0 9.0 3.0 5.0
Sales 3.0 5.0 13.0 20.0
Office Clerical 9.0 14.0 46.0 70.0
Skilled 8.0 12.0 1.0 2.0
Semi-Skilled 19.0 28.0 3.0 5.0
Laborer-Unskilled 24.0 36.0 3.0 5.0
Service Workers 21.0 32.0 31.0 46.0
 
 
 83
 (Section V, Par. 1).
 
 VAN DUSEN, Circuit Judge, (concurring):
 
 84
 While concurring in the judgment of the court, I respectfully am unable to agree with the majority's view of (1) the effect of public policy behind Title VII, and (2) the legislative history of that title. See majority opinion at pages 704-710. Because this case is being remanded and past discrimination may be found on an amplified record in this or a related case, I will state my views briefly.[1]
 
 
 85
 The importance of the policy underlying Title VII was acknowledged by the Supreme Court in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), a case involving 'the proper relationship between federal courts and the grievance-arbitration machinery of collective bargaining agreements in the resolution and enforcement of an individual's rights to equal employment opportunities under Title VII . . ..' Id. at 38, 94 S.Ct. at 1014-1015, as follows:
 
 
 86
 'Legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, 42 U.S.C. 2000a et seq., Congress indicated that it considered the policy against discrimination to be of the 'highest priority.' Newman v. Piggie Park Enterprises, supra, at 402 (Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263). Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. And, in general, submission of a claim to one forum does not preclude a later submission to another. See 42 U.S.C. 2000e-5(b) and (f) (1970 ed.Supp. II); McDonnell Douglas Corp. v. Green, supra (McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.) Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.
 
 
 87
 . . . .her
 
 
 88
 'Title VII . . . concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of those rights would defeat the paramount congressional purpose behind Title VII.' 415 U.S. at 47-49, 51-52, 94 S.Ct. at 1019-1020, 1021. See also id. at 44-45, 56-60, 94 S.Ct. 1011.
 
 
 89
 The importance of this policy has prompted courts to require that labor agreements of various types be modified to effect the ends of Title VII. See, e.g., Waters v. Wisconsin Steel Works, 502 F.2d 1309 (7th Cir. 1974); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Vogler v. McCarty, 451 F.2d 1236 (5th Cir. 1971); Contractor's Association of Eastern Pa. v. Sec'y. of Labor, 442 F.2d 159, 174 (3d Cir. 1971); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th Cir. 1969); Savannah Printing Union v. Union Camp Corp., 350 F.Supp. 632, 636 (S.D.Ga.1972). These modifications were ordered even though the seniority provisions were 'neutral on their face, and even neutral in terms of intent,' where the effect was 'to 'freeze' the status quo of prior discriminatory employment practices.' Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). See also Robinson v. Lorillard, 444 F.2d 791, 796-797 (4th Cir. 1971). The objective criterion of intent and the rationale of these cases apply equally to plant-wide seniority systems where the plant formerly hired on a 'whites only' basis.[2] 'If the seniority practices struck down . . . were not 'bona fide' within the meaning of section 703(h), because they discriminated on grounds of race, and if former exclusionary practices in those cases established that the present differences in treatment of whites and blacks were the result of 'an intention to discriminate' within the meaning of section 703(h), then, for the identical reasons, section 703(h) does not validate seniority practices in formerly white only plants.' Cooper & Sobol, Seniority and Testing Under Fair Employment Law: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1629 (1969).[3] It is true that certain cases have indicated that plant-wide seniority systems would be treated differently from job or departmental seniority. Waters v. Wisconsin Steel Works, 502 F.2d 1309, 1318-1320 (7th Cir. 1974); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 994-995 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). However, the basis for such distinction has been the courts' view of the legislative history of the Act, rather than any conclusion that the principles which required modification of other seniority practices did not apply to plant seniority. I disagree with the interpretation of the legislative history expressed in Waters and Local 189, as well as by the majority at pp. 707-710.
 
 
 90
 I find persuasive the writers who contend that the legislative history indicates that Congress, in enacting Title VII, did not intend to preclude remedies altering plant seniority which perpetuates discrimination.[4] See Watkins v. U.S.W.A., 369 F.Supp. 1221, 1227-1229 (E.D.La.1974), app. pending; Cooper & Sobol, supra; Comment, The Inevitable Interplay of Title VII and the National Labor Relations Act: A New Role For the NLRB, 123 U.Pa.L.Rev. 158, 163-64 (1974). But see Note, Business Necessity Under Title VII of the Civil Rights Act of 1964: A No-Alternative Approach, 84 Yale L.J. 98, 100-01 n. 17 (1974).
 
 
 91
 For these reasons, I disagree with the majority's conclusion at page 710 that no relief could be forthcoming to an aggrieved party who established that a plant-wide seniority system embodied in the collective bargaining agreement perpetuated past discrimination without proving a subjective discriminatory intent.
 
 
 
 [1]
 28 U.S.C. 2201 provides:
 In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
 28 U.S.C. 2202 provides:
 Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.
 
 
 [2]
 The Unions are Locals 327, 749, 1289, 1298, 1303, 1309 and 1314 of the International Brotherhood of Electrical Workers
 
 
 [3]
 The Company also sought a declaratory judgment with respect to its obligations under Executive Order 11,246, 3 C.F.R. 169 (1974), 42 U.S.C. 2000e, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. The district court, however, did not base its order on either the executive order or the statute
 
 
 [4]
 The New Jersey Division of Civil Rights failed to file a response after it had been served with the complaint. It has also failed to participate in any stage of this litigation
 GSA and OFCC were included as defendants in light of the Company's status as a federal contractor. As a federal contractor the Company is subject to the equal employment opportunity requirements of Executive Order 11,246, which are enforced by GSA and OFCC. In denying GSA's and OFCC's motion to dismiss as to them and in promulgating its order of September 24, 1974, the district court specifically refused to interpret the effect of Executive Order 11,246. The court did indicate that its order 'in no way restricts these defendants (GSA and OFCC) in pursuit of their obligations pursuant to Executive Order 11,246'.
 
 
 [5]
 Although the Company characterizes its position as that of a 'neutral' party, in substance the Company has taken adverse (albeit inconsistent) positions to those advanced by the Unions and the EEOC. To each defendant, the Company has implicitly asserted that in respect to layoffs it is obligated to adhere to its contract with the other. While inconsistent, the Company's position sets forth the requisite adverse legal interests to present a justiciable case or controversy. See II., infra
 
 
 [6]
 The Company moved for an order to show cause after the Unions had filed a joint answer (filed July 25, 1974) but prior to the filing of answers by the Government defendants GSA and OFCC (filed September 25, 1974) and EEOC (filed October 3, 1974)
 
 
 [7]
 EEOC listed the following as necessary material facts:
 '5. This office does not presently have information as to whether any of the employees who will be laid off or who have already been laid off were the actual victims of past discriminatory practices of plaintiff which the Conciliation Agreement seeks to remedy.
 '7. It is impossible to determine from the report submitted by plaintiff pursuant to its obligations under the Conciliation Agreement, whether plaintiff has fulfilled the requirements of the Affirmative Action Program executed under the provisions of the Conciliation Agreement. The report submitted is inadequate and meaningless in making any relevant determinations as to plaintiff's compliance with the Conciliation Agreement.
 '8. The development of the above facts, as well as the information regarding any alternative which plaintiff may have available to allow it to absorb employees protected by Title VII, within the framework of its present economic conditions, are essential material facts not presently before this Court in the pleadings, affidavits, and other papers on file in this matter.'
 While we recognize that disputes may indeed exist as to these particular facts, when and if developed, we cannot say that these facts were material to the issues before the district court on the motion for summary judgment. The issues before the district court were those of contract interpretation and we fail to discern how these facts, or the lack of them as asserted by EEOC, have a bearing upon those issues. As discussed in Part IV infra, these facts cannot be deemed material so as to preclude summary judgment.
 
 
 [8]
 The oral opinion is currently reported at 8 FEP Cases 690
 
 
 [9]
 As noted, in its opinion the district court specifically refused to consider issues involving Executive Order 11,246 and Title VII violations. See n.4, supra. Compare Western Additions Community Organ. v. N.L.R.B., 158 U.S.App.D.C. 138, 485 F.2d 917 (1973), cert. granted, 415 U.S. 913, 94 S.Ct. 1407, 39 L.Ed.2d 446 (1974)
 
 
 [10]
 We note that the conciliation agreement does not define the term 'relevant labor market.' The EEOC used New Jersey statewide percentages of females and minority group members in finding reasonabel cause to believe the Company discriminated against these groups. Although the Unions contest a statewide application for the term 'relevant labor market', we need not, and do not, decide the propriety of such an inclusive definition in view of our disposition of the issues currently before us
 10A New Jersey State AFL-CIO filed a brief in this matter by consent of the parties.
 
 
 [11]
 The district court provided that it would stay its order pending application to this Court for a stay pending appeal only on the condition that the party seeking the stay indemnify and exonerate the Company 'of and from any and all claims for reinstatement and back-pay made by any employee laid off during the effectiveness of the stay who is found to have been improperly laid off at the final determination of the appeal.' The district court did not enter such a stay absent compliance by the Unions with the conditions announced by the district court. Consequently, from September 5, 1974 to October 9, 1974, the Company laid off employees pursuant to the district court directives
 
 
 [12]
 The order denying EEOC's motion to vacate was filed on November 19, 1974
 
 
 [13]
 The facts, indicated in the text, appear in the complaint and in the various affidavits filed and are undisputed
 
 
 [14]
 In the charge originally filed with the EEOC the term 'minority group persons' included Blacks, Jews and Spanish-surnamed Americans. However, in the arguments before this Court and in the data regarding the racial and ethnic breakdown of the Company's employees, the term 'minority group persons' has been used (and as we use that term in this Opinion) primarily to describe Blacks and Spanish-surnamed Americans
 
 
 [15]
 In re Jersey Central Power & Light Co. and Int'l Bhd. of Elec. Workers, Case No. YNK2-063 (Jan. 19, 1973)
 
 
 [16]
 In issuing its decision as to 'reasonable cause', the EEOC withheld decision as to the Company's recruitment and training practices as they affected females and minority group persons and as to the Company's promotion practices as they affected minority group persons only
 With respect to the defendant Unions, EEOC found reasonable cause to believe that they discriminated against women by virtue of the maternity benefit provisions in the collective bargaining agreement. The EEOC withheld decision with respect to allegations of discrimination by the Union in representation, referral and membership practices.
 Other than as may be reflected in the conciliation agreement, the record does not reveal the disposition by the EEOC of those issues which were so reserved.
 
 
 [17]
 See n. 22, infra
 
 
 [18]
 The percentages to be attained by December 1977, the end of the five year affirmative action plan, and the hiring rate necessary to achieve those percentage goals, are set forth in the conciliation agreement:
 
 
 [19]
 The conciliation agreement also sets forth a general Union obligation under which the Unions acknowledge their express obligations under the agreement and further agree 'that they shall not resist other provisions as set forth in this Agreement.' (Section VIII)
 
 
 [20]
 The uncontradicted affidavit of Edward Semoneit, President of the Unions' System Council which bargains on behalf of the Unions, reveals that during negotiations for the conciliation agreement, the EEOC attempted to negotiate a seniority system which would give minority group and female employees greater seniority than they would actually have had under the prevailing method of calculating employee seniority. The EEOC's suggestion, however, was apparently rejected as it does not appear in the conciliation agreement. As stated in Mr. Semoneit's affidavit:
 The EEOC proposed for the conciliation agreement that minority and female employees be given artificial seniority for job selection and transfer purposes. We opposed this proposal and the representative of the EEOC withdrew it. It was agreed, as is stated in the executed conciliation agreement, that all employees receive normal seniority pursuant to the terms of the collective bargaining agreement.
 Semoneit Affidavit, supra n. 18, P4 at 2.
 
 
 [21]
 See Brief for Appellants at 2-3
 
 
 [22]
 Seniority may be measured by a number of different methods. We here use the terms 'plant-wide' and 'company-wide' seniority to describe seniority measured by the total length of employment with the employer. Other means of establishing seniority which are not employed here by the Company and Unions are: length of service in a department ('departmental seniority'); length of service in a line of progression ('progression line' seniority) or length of service in a job ('job' seniority). See generally Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1601 (1969)
 
 
 [23]
 Under the Company's plant-wide seniority system, preference is afforded to the senior worker for purposes of promotion, transfer and other forms of job assignment as well as for purposes of layoff. See Agreement between Jersey Central Power & Light Co. and Local Unions 327 et al. P3.1, 3.8(a)-(e), Dec. 3, 1973
 
 
 [24]
 See Company Affidavit of James R. Jones, P7 (filed July 18, 1974). GSA and OFCC likewise adopted (albeit unofficially, see GSA and OFCC Brief at 9, 12-13) the position that the Company's proposed method of layoff would violate Executive Order 11,246. Id at P4-6; Affidavit of James R. Leva, P12 at 4 (filed July 18, 1974)
 
 
 [25]
 The question submitted to the arbitrator was:
 'Will a layoff of employees in accordance with the seniority provisions of Article 3.2(a) constitute a violation of the non-discrimination provisions of Article 1.1(d) of the collective bargaining agreement when applied to the layoff announced on July 16th? If so, what method should be utilized in selecting employees for layoff?'
 Article 1.1(d) of the agreement is apparently broader than coverage under Title VII in that it additionally proscribes discrimination with respect to marital status and military service. It provides:
 The Company and the Union agree that the application of the various provisions of this Agreement shall in no way serve to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment or otherwise affect his status as an employee because of such individual's race, color, creed, ancestry, religion, national origin, sex, age, place of birth, marital status, or liability for service in the armed forces of the United States.
 
 
 [26]
 The opinion of the arbitrator which was to follow his award does not appear in the record. We note, however, that the arbitrator did not rule on or consider the possibility of conflict between layoffs in accordance with seniority and the conciliation agreement
 
 
 [27]
 Because of the system of layoff utilized by the Company it is often difficult to identify in advance the employee who is to be laid off or terminated. 'Layoffs' are accomplished in two manners: (1) direct layoffs of most junior employees from the bottom of the Company's companywide seniority list, and (2) the abolishment of jobs held by senior employees. Layoff accomplished by the latter method precludes identification of the individual who will actually lose his or her job at the time that the senior employee's job is abolished. The inability to identify the employee results from a 'bumping' system established by the collective bargaining agreement: i.e., senior employees who have been displaced can 'bump' employees junior to them on the companywide seniority list and thereby fill the position formerly held by the more junior employee. Article III, P3.2(a) of the collective bargaining agreement in part provides:
 'No senior employee shall be laid off as long as any work which he can reasonably be expected to do is being performed by an employee junior in point of service.'
 
 
 [28]
 The first week of layoff had a similar disproportionate effect on minority group employment among total Company employees. The percentage of male and female minority group employees decreased from 6.7% On July 27, 1974 to 5.6% As of August 30, 1974
 The figures and percentages noted above and in the text are found in Affidavit of James R. Leva, Attachment D., supra n. 24.
 
 
 [29]
 Id. The percentage of women listed in James R. Leva's Affidavit represents both white and minority group female employees. Consequently, female minority group persons were included in percentages for both minority group employees and female employees. We do not, however, believe this 'doublecounting' of minority group female employees to be of significance in our analysis of the issues here presented
 At oral argument before us, counsel for the Company stated that by November 22, 1974 a total of 292 employees were to be laid off, of whom 83, or 28.4%, were minority group members. The individuals who were to be laid off or terminated by that date, had been notified, and thereby were identified. The effect of this layoff on the proportion of minority group employees would be to decrease the percentage of male and female minority group employees in the bargaining unit from 6.4% On August 30, 1974 to approximately 4.9% As of November 22, 1974. No representations were made to the Court that this layoff would similarly create a disproportionate impact upon the percentage of female employees.
 
 
 [30]
 The question of lack of subject matter jurisdiction was raised in the district court by a motion to dismiss filed by defendants GSA and OFCC. This motion was denied by the district court and defendants GSA and OFCC have not filed a separate notice of appeal. The failure of any party to raise a jurisdictional issue on appeal does not foreclose us from an inquiry into jurisdiction sua sponte. See Mansfield, Coldwater & Lake Michigan Ry. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884); Allegheny Airlines, Inc. v. Pennsylvania Public Utility Comm'n, 465 F.2d 237, 241 (3d Cir. 1972), cert. denied, 410 U.S. 943, 93 S.Ct. 1367, 35 L.Ed.2d 609 (1973). Accordingly, this Court requested all parties, including GSA and OFCC, to address the issue of jurisdiction during oral argument before us
 
 
 [31]
 The Company asserted as statutory grounds for jurisdiction: the Declaratory Judgment Act, 28 U.S.C. 2201, 2202; Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.; 28 U.S.C. 1346; and section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. 185. Although not referring to any statute, the Company further contended that jurisdiction was conferred 'by the laws of the United States of America regulating commerce . . ..'
 We recognize that most of the grounds asserted do not properly invoke jurisdiction in this context. The Declaratory judgment Act, 28 U.S.C. 2201, 2202, does not of and by itself confer jurisdiction upon the federal courts, but requires an independent jurisdictional basis. See, eG., Schilling v. Rogers, 363 U.S. 666, 677, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960); Getty Oil Co. (Eastern Operations), Inc. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L,. ed.2d 256 (1973). As the employer cannot be the victim of discriminatory employment practices, the Company cannot invoke jurisdiction under Title VII. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 54, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); Oubichon v. North American Rockwell Corp., 482 F.2d 569, 573 (9th Cir. 1973). Finally, 28 U.S.C. 1346 is incapable of conferring jurisdiction here as only equitable relief is sought. Section 1346 establishes jurisdiction for actions to recover internal revenue taxes; for actions against the Government in negligence; for civil actions under the Internal Revenue Code 7426; for actions to quiet title in real property in which the United States claims an interest and for
 'Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, . . . or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . ..'
 28 U.S.C. 1346(a)(2). This last cited provision is limited to conferring jurisdiction for actions seeking recovery of a money judgment, which is not claimed here. Richardson v. Morris, 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).
 
 
 [32]
 Although in the proceedings below the district court viewed the collective bargaining agreement as a contract to be construed pursuant to New Jersey state law, it did so erroneously. Federal law is to be applied as the substantive law in actions arising under 301, including those actions which seek declaratory judgment. 'Federal interpretation of the federal law will govern, not state law.' Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Indeed an action arising under 301 is controlled by federal substantive law, even though the proceeding is in a state court. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)
 
 
 [33]
 Section 1331 in pertinent part provides:
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
 We are of the view that the Company's verified complaint and accompanying affidavits are sufficient to establish and amount in controversy in excess of $10,000.00. We reach this conclusion even though the Company failed to specifically allege an amount in controversy, setting forth instead figures and information by which its possible liability for back pay claims and other expenses may be calculated.
 
 
 [34]
 As we hold jurisdiction is present under the grounds noted in the text, we believe it unnecessary to decide whether the district court would also have jurisdiction under 1337 under the proposition that the conciliation agreement was entered into by the EEOC on authority granted by the Civil Rights Act of 1964, assertedly an Act of Congress regulating commerce. Cf. Gardner v, Nashville Housing Auth., 468 F.2d 480 (6th Cir. 1972). Section 1337 in pertinent part provides:
 The district courts shall have original jurisdiction of any civil actions or proceeding arising under any Act of Congress regulating commerce . . ..
 The tests of 'arising under' required by Section 1337 are the same as those demanded by Section 1331, except that no jurisdictional amount need be alleged. Felter v. Southern Pacific Co., 359 U.S. 326, 329 n. 4, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959); Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942).
 
 
 [35]
 The Supreme Court has indicated that a case or controversy for judicial resolution is presented where a plaintiff is 'either presently or prospectively subject to the regulations, proscriptions, or compulsions that he . . . (is) challenging.' Laird v. Tatum, 408 U.S. 1, 11, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972). We believe that this language of the Supreme Court has particular application here, even though EEOC has neither sought judicial enforcement of the conciliation agreement nor instituted administrative proceedings under Title VII. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 151-154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)
 
 
 [36]
 See n. 5 supra
 
 
 [37]
 When dealing with contract actions, this Court is to review as a matter of law the interpretation given by the district court to the pertinent provisions of the written contract. See Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 773 (3d Cir. 1972); S. S. Silberblatt, Inc. v. Seaboard Surety Co., 417 F.2d 1043, 1055 (8th Cir. 1969)
 This standard of review would not be altered even if the contract were executed by a Government party. Vitex Mfg. Co. v. Government of Virgin Islands, 351 F.2d 313 (3d Cir. 1965); see United States v. Hanna Nickel Smelting Co., 400 F.2d 944 (9th Cir. 1968); F. L. Smidth & Co. V. United States, 409 F.2d 1369 (C.C.P.A. 1969).
 
 
 [38]
 We are not confronted here, as the district court erroneously believed itself to be, with a 'private' collective bargaining agreement to be construed according to state law, and a government contract to be interpreted by reference to federal law. Federal substantive law controls in the interpretation of both the collective bargaining agreement, see Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and the conciliation agreement, see United States v. Seckinger, 396 U.S. at 209-210, 90 S.Ct. 880 and United States V. County of Allegheny, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944)
 
 
 [39]
 In this regard, we note that the district court concluded that the 'specific contigency (layoffs by seniority) was not dealt with in the formulation of the (conciliation agreement) program.'
 Oral Opinion Tr. at 7; 8 FEP Cases at 692.
 
 
 [40]
 The contractual exception to filling jobs by female and minority group 'new hires' (i.e., 'where a job is not to be filled from within') represents a classic example of the seniority 'bumping' system. The terms of the paragraph quoted above from the conciliation agreement expressly leave intact the 'bumping' system established by the collective bargaining agreement
 
 
 [41]
 Other references to 'new hires' are similarly made in section III, 'Recruitment and Hiring Practices.' Patagraph 10 provides for credit to be given for pre-employment experience 'in filling the existing new openings with new hires . . ..' paragraph 12 pertains to obtaining referrals of female and minority group persons from job referral organizations, provided that 'the Company shall estimate the number of vacancies expected to be filled by new hires. . ..' and paragraph 13D requires that 'as job vacancies occur which are to be filled with new hires, the employer will first consult the Affirmative Action file . . ..'
 The reporting obligations of the conciliation agreement is similarly directed to only new hires. Section IX, 'Reporting,' in part requires:
 
 
 [3]
 A listing of all positions filled by new hires identifying the name, date of hire, rate of pay, race, sex and job title
 
 
 [42]
 The exception created by this paragraph to jobs for female and minority group employees (i.e. 'vacancies occasioned by layoff . . . shall not be considered as vacancies') is consistent with the exception created by the conciliation agreement in section III, paragraph 9. See n. 40, supra. Section III, paragraph 9 does not require the company to use 'reasonable efforts' to assign a female or minority group worker to jobs which are 'to be filled from within.' In this context, the phrase 'jobs to be filled from within' has obvious reference to an employment vacancy occasioned by layoff. In such circumstances, the 'bumping' system nevertheless allows a worker senior to the worker laid off to occupy the position vacated by the layoff. As such, the position opened by the layoff cannot be and is not, properly termed a 'vacancy' for purposes of job assignments for female and minority group workers
 
 
 [43]
 It is acknowledged that the collective bargaining agreement was signed approximately four months earlier than the conciliation agreement
 
 
 [44]
 'If the new agreement contains terms that are clearly inconsistent with the previously existing contract . . ., the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new . . .. It (the new agreement) operates as a discharge by substitution only so far as the inconsistency extends.'
 6A. Corbin, Contracts, 1296 (1962).
 
 
 [45]
 In this context, we reiterate our view that the contracts before us are to be interpreted according to principles of general contract law inasmuch as Congress has not adopted a different standard by which the conciliation agreement is to be interpreted. See, e.g., Priebe & Sons v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947)
 
 
 [46]
 In a static economic situation where an employer under this type of conciliation agreement is neither obliged to lay off white male workers and replace them nor to add workers, the consequence of EEOC's interpretation is that the employer would nevertheless be compelled to hire female and minority group workers or be found to act in continuous violation of the conciliation agreement. If we were to adopt EEOC's argument, it would mean that the occurrence of any event which prevented an increase in the proportion of female and minority group workers would be considered as frustrating the objective of the conciliation agreement and thereby constitute a violation of such agreement
 We decline to interpret the conciliation agreement in the manner urged upon us. We fail to discern how the objective of the agreement can lend support to the proposition that whenever the Company, because of economic need, lays off employees and does not accept new hires, it frustrates the objective of the conciliation agreement.
 
 
 [47]
 In support of this analysis the district court cited Edwards v. Leopoldi, 20 N.J.Super. 43, 89 A.2d 264 (App.Div.), cert. denied, 10 N.J. 347, 91 A.2d 671 (1952). A more recent New Jersey case applying these principles is Porcelli v. Titus, 108 N.J.Super. 301, 261 A.2d 364 (App.Div.1969), cert. denied, 55 N.J. 310, 261 A.2d 355 (1970). In that case the state court approved a Board of Education's unilateral suspension of the collective bargaining agreement's promotion procedure, when local civil disorders provoked an educational crisis requiring greater promotional opportunities for Blacks than existed at the time under the Union contract. The court in part stated:
 'The concept of impossibility should prevail where a particular provision in a school contract is rendered impractical by subsequent events demanding changes in an educational program in order to give meaningful effect to an overriding public policy.' 108 N.J.Super. at 313, 261 A.2d at 370.
 We note, moreover, that the state court in Porcelli in holding performance to be 'impossible' under the Union contract believed that to compel performance according to the provisions of the Union contract would be contrary to the public policy and welfare.
 
 
 [48]
 To date, two opposing interpretations exist of the legislative history of Title VII as it pertains to company-wide seniority systems under collective bargaining agreements. Compare Waters v. Wisconsin Steel Works, 502 F.2d 1309 (7th Cir. 1974) with Watkins v. Steel Workers Local 2369, 369 F.Supp. 1221, 1227-1229 (E.D.La.1974), appeal docketed No. 74-2604 (5th Cir. June 17, 1974). Watkins, under its construction of congressional intent, holds that company-wide seniority systems may be held to violate Title VII if found to perpetuate the effects of past discrimination. Waters, on the other hand, by its interpretation of congressional intent, holds that a company-wide seniority system, neutral on its face, will not violate Title VII. Neither court held that Congress intended that plant-wide seniority systems, without more, violate public policy. Hence, whether we adopt the Watkins or Waters interpretation of legislative history, we nevertheless conclude that public policy does not proscribe seniority provisions such as those at issue here
 
 
 [49]
 In this regard, we recognize that those courts confronted with devising remedies for aggrieved workers who were discriminated against under departmental seniority systems, have granted a form of relief which substitutes a plant-wide seniority system for a departmental system. E.g., Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971). Under such relief, departmental seniority is discounted, as employees must compete on the basis of actual number of years employed by the Company. Consequently, a minority group worker hired prior to a white worker, but having less years of seniority in the previously all-white department, becomes senior to the white worker for benefits and promotions. However, a minority group worker hired after a white worker remains junior in seniority to the white worker even after institution of a plant-wide seniority system. See, e.g., Bethlehem Steel Corp., supra at 661
 
 
 [50]
 Accord Note, Business Necessity under Title VII of the Civil Rights Act of 1964: A No-Alternative Approach, 84 Yale L.J. 98, 100-01 n. 17 (1974); and discussion in Devel-opments in the Law-- Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1159-60 (1971)
 
 
 [51]
 We recognize that the Company's affidavits contain statistics for the period 1966-1974 revealing a disproportion in the number of minority group and female employees. However, we decline to equate as a matter of law such a statistical showing with a per se violstion of Title VII. But see Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 426 (8th Cir. 1971) (holding statistics of gross disparity to constitute a per se violation). At the most, we believe the better view is that statistics showing disparity may present a prima facie case of Title VII violation, but, without more, mere statistics are not conclusive proof of discriminatory practices. See United States v. Hayes Int'l Corp., 456 F.2d 112, 120 (5th Cir. 1972). Here the record reveals no more than just bare statistics. In any event, by reason of our disposition (see n. 54, infra) even these statistics are unavailing to a litigant unless and until the plant-wide seniority provisions are ceclared not to be bona fide
 
 
 [52]
 Other than the Company affidavits (see note 51, supra), the record is completely silent as to proof or assertions that discriminatory employment practices exist or that the seniority provisions are not bona fide
 
 
 [53]
 See 42 U.S.C. 2000e-2(h); note 49, supra
 
 
 [54]
 Our analysis would make it appropriate for a district court to have evidence presented in two stages. At the first stage, evidence would be received with respect to the bona fide nature of the plant-wide seniority system. if, based on such evidence, the court finds the challenged plant-wide seniority system to be bona fide, no further evidence or inquiry would be needed. However, if it is established that the plant-wide seniority system is not bona fide, then at a second evidentiary stage an aggrieved or proper party seeking relief may adduce all evidence relevant to a Title VII proceeding, including but not limited to past discriminatory employment practices. See, e.g., Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974); United States v. N. L. Indus., Inc., 479 F.2d 354, 364 (8th Cir. 1973); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Bethlehem Steel Corp., 446 F.2d 65 i (2d Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), petitions for cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) and 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972); Papermakers Local 189, 416 F.2d at 988; see, also, Peters v. Missouri-Pacific R. Co., 483 F.2d 490 (5th Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 238 (1973). In this context, a bona fide plantwide seniority system is one which is facially neutral and was neither designed nor intended to disguise discriminatory practices
 
 
 [55]
 Section 703(j), 42 U.S.C. 2000e-2(j), in pertinent part provides:
 (j) Nothing contained in this subchapter shall be interpreted to require any employer, . . . to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, . . ..
 
 
 [56]
 Although a recent district court case has rejected the quoted congressional statements as an interpretive guide because of this chronology, we do not agree with its analysis. Watkins v. Steel Workers Local 2369, 369 F.Supp. 1221, 1227-1229 (E.D.La.1974), appeal docketed No. 74-2604 (5th Cir. June 17, 1974). We believe that the legislative statements made prior to the introduction of 703(h) and dealing directly with seniority systems are entitled to weight in interpreting congressional intent as to seniority systems as the enactment of 703(h) was not designed to change the intent and effect of Title VII. See 110 Cong.Rec. 12,723 (1964); Note, supra n. 50, at 100-01 n. 17
 
 
 [57]
 The Seventh Circuit case, Waters v. Wisconsin Steel Works, supra, was tried under Title VII and 42 U.S.C. 1981. The complaint charged that the defendant's employment practices and policies constituted individual discrimination against the two plaintiffs. In the Fifth Circuit case, Papermakers Local 189, supra, the action was initiated by the Government to set aside job seniority in any form as discriminatory against black employees under Title VII
 
 
 [58]
 There is no case which we have examined which has been brought in a similar procedural context. All of the cases presenting analogous issues have resulted from either a complaint alleging individual or class discrimination in violation of Title VII, See, e.g., Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974), or a classic 'pattern or practice' suit instituted by the Government, see, e.g., United States v. N. L. Indus., Inc., 479 F.2d 354 (8th Cir. 1973)
 
 
 [1]
 Even though the parties to this case fail to create a record on remand which permits relief under 42 U.S.C. 2000e-1 ff., other parties, such as employees affected by the current layoffs, are not foreclosed from bringing actions under Title VII or alternative statutes such as 42 U.S.C. 1981, see Watkins v. U.S.W.A., 369 F.Supp. 1221 (E.D.La.1974); Comment, Implying Punitive Damages in Employment Discrimination Cases, 9 Harv.Civ. Rights-Civ.Lib.L.Rev. 325, 348 (1974). Also, actions can be brought under state law pursuant to Title 10, N.J.S.A. 5-13 ff., see 42 U.S.C. 2000e-5(c) and (d), and, possibly, under the N.L.R.A. for breach of the union's duty of fair representation. See Western Addition Community Org. v. N.L.R.B., 158 U.S.App.D.C. 138, 485 F.2d 917, 930 n. 38 (1973), cert. granted, 415 U.S. 913, 94 S.Ct. 1407, 39 L.Ed.2d 446 (1974). But see Comment, Labor Unions and Title VII: The Impact of Mansion House, 41 Tenn.L.Rev. 718, 721-22 (1974). Under these circumstances, the statements of this court in the majority opinion may become very important in subsequent proceedings in the district court in this or related cases of the type described above
 
 
 [2]
 For example, I cannot agree with the majority's statement (p. 706 of filed opinion) that 'the only evidence probative in a challenge to a plant-wide seniority system would be . . . evidence directed either to the neutrality of the seniority system or evidence directed to ascertaining an intent or design to disguise discrimination.' See also last sentence of note 54. After the changed conditions occurring through employment of minority persons in early 1974, the 'different terms, conditions or privileges of employment pursuant to a bona fide seniority . . . system' may have become, and hence their continuation would be, 'the result of an intention to discriminate.' See 42 U.S.C. 2000e-2(h)
 
 
 [3]
 For the effects of plant-wide seniority on a minority group in a period of lay-offs in a specific situation, see Plantwide Seniority, Black Employment and Employer Affirmative Action, 26 Industrial & Labor Relations Review 686 (1972)
 
 
 [4]
 For this reason, I cannot agree with the sweeping language in the last sentence of the second complete paragraph ending on page 706 of the majority opinion